POPE MFG. CO. v. ARNOLD, SCHWINN & CO.

(Circuit Court, N. D. Illinois, Eastern Division. February 14, 1910.)

No. 27,035.

1. PATENTS (§ 69\*)—ANTICIPATION—PRIOR PUBLICATION.

Under the rule that to constitute a prior publication which will invalidate a subsequent patent the publication must contain such a substantial representation of the patented device as would enable any person skilled in the art to make, construct, and practice the invention to the same practical extent as he would be enabled to do if the information was derived from a prior patent, a published illustration and description of a bicycle, showing every detail of a part subsequently patented by another, except that it did not show that a tube for containing the pedal shaft, shown by the patent to be without perforations, and so appearing in the illustration, may not have been perforated or cut away on the bottom or the opposite side not seen—there being, however, nothing to indicate that such was the fact—fulfills all the conditions of the rule, even conceding

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that there was a patentable difference between a perforate and imperforate tube used for such purpose.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 84; Dec. Dig. § 69.*]

**2. PATENTS (§ 328*)—ANTICIPATION—BICYCLE.**

The Smith patent, No. 392,973, for an improvement in bicycles consisting of a transverse tube for holding the pedal shaft, built rigidly into and made an integral part of the frame, in view of the prior art as disclosed in actual structures and prior publications in England, is void for anticipation and lack of novelty.

In Equity. Suit by the Pope Manufacturing Company against Arnold, Schwinn & Co. On final hearing. Decree for defendant.

Redding, Greeley & Austin, William B. Greeley, and William A. Redding (C. K. Offield, of counsel), for complainant.

Fred Whitfield (Dyrenforth, Lee, Chritton & Wiles, of counsel), for defendant.

KOHLSAAT, Circuit Judge. Complainant brings suit to restrain infringement of claims 1 and 6 of patent No. 392,973, granted to the assignee of William E. Smith, the patentee, on November 13, 1888, on application filed February 16, 1888, for improvements in bicycles. The claims in suit read as follows, viz.:

"1. In a rear-driving front-steering bicycle, the frame or reach provided with the rigid transverse tube, c, built rigidly into and forming an integral part of said frame and adapted, substantially as described, to receive the pedal shaft.

"6. In a frame for bicycles and kindred machines, a transverse shaft-receiving tube, c, provided with necks, $c^8$ and $c^9$, to receive the front and rear ends of the frame or reach."

The gist of the invention consists in the combination with the reach or frame, of a transverse bearing-tube, c, supported by and integral with the reach, the whole forming a single rigid and integral structure. It will be observed that, while both claims call for a rigid transverse pedal-shaft receiving tube in a bicycle, claim 1 is for a bearing-tube built rigidly into and made an integral part of the bicycle frame, irrespective of the means by which this is effected, while the means of claim 6 is limited to the bracket or bearing-tube having projecting necks whereby it may be built with, and become an integral and rigid part of the frame. The rigid and integral relation between the bracket and the frame may be effected by brazing or welding. The patentee at page 1, line 78, of the specification says:

"Heretofore the pedal-shaft has been carried in two bearings attached to the lower ends of a forked arm or standard depending from the frame, and owing to the severe strain exerted through the chain it has been found that the forked standard would twist, and by throwing the bearings out of line cause an excessive amount of wear and friction."

An examination of the prior art makes it plain that this statement is not justified by the facts. The Rover, Ranger, Raleigh, and other forms of bicycle and tricycle frames shown in certain prior English publications in evidence, and conceded to have been circulated in this country, clearly show rigid and integral bearings located in line, or in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

upper or lower contact with the reach. The patent provides that the bracket shall be centrally located, in a direct line—that is, between the rear and front portions of the reach or lower portions of the frame, or above or below the reach. It is evident that the combination with a rear-driving, front-steering bicycle called for in claim 1 is not of the essence of the invention, since this form of bicycle was old, and no invention could be predicated upon the application of the bracket to that particular device. The specification (lines 12 and 13, p. 1) says certain of the features are also applicable in machines of other forms. This would be true of the bracket. The defenses are (1) that Smith was not the first inventor; and (2) that the patent is in view of the prior art invalid.

The evidence relied on to establish the first defense is of weight only so far as it bears upon the second defense, therefore it is deemed necessary to consider only the latter. The patent was sustained by the Circuit Court of the United States for the Northern District of New York in a suit entitled Pope Mfg. Co. v. H. P. Snyder Mfg. Co., on July 29, 1905. The record in that case for both parties is stipulated into this case. This, together with a large amount of new evidence, constitutes the record now before this court. As above noted, the patentee erred in stating the prior art as to the location of pedal bearings. In this, the Patent Office Examiners must have concurred, since the file-wrapper shows no suggestion of amendment in that respect. It would, therefore, seem to be a reasonable deduction to hold that in this proceeding the grant of the patent is not attended with that presumption of invention, which usually attaches to a grant. While some attempt was made to carry the date of invention back of February 16, 1888, when the application was filed, the evidence adduced in support thereof is not satisfactory, so that the date of filing of the application must be taken as the date of invention for the purposes of this hearing. The specification (page 2, lines 53 to 70) affords some discretion as to the location of the bracket with regard to the frame:

"The tube, c, is commonly brazed or cast or forged integral with tubular necks, one of which, c, rising therefrom enters and serves to support the lower end of the tubular seat-standard, J, and to which it is brazed or otherwise fastened. When the frame is made in the particular form herein shown, the bearing-tube, c, will also have two horizontal necks extending respectively forward and rearward, as shown at c⁸ and c⁹ in Fig. 14, to enter the front and rear portions of the frame. When thus constructed, the bearing-tube and its necks serve as a means for uniting the two parts of the main frame or reach. When, however, the frame is of the usual shape, it may be made continuous from end to end and the tube applied transversely to its upper or its under side."

To sustain its first contention, defendant introduced in evidence, among others, the testimony of one Alfred J. Gould, who was found through the medium of the publicity given in the Snyder Case. He testified that he was the son of an English manufacturer of bicycle parts in England, in which line of business he had been actively engaged since 1866, having ridden a bicycle over this country in 1874. In 1875 he returned to England and came back in 1876 in connection with the bicycle department of the Philadelphia exhibition. Thereafter, until 1885, he was back and forth between the two countries.

Smith, the patentee, was also an Englishman, having come to this country in 1882, and while in England, was acquainted with Gould in a business way. In 1884, Gould testifies he went to Smith's house, and that Smith knowing he was about to return to England requested him to bring back some bottom-brackets of the latest design and also some patterns from which to make castings here. •On his arrival in England, Gould looked about for the newest form of bottom-brackets. He saw a drop frame (lady's form) at the place of business of a friend named Palmer, and explained the same to Smith later. At Gorton's₁ place of business in Wolverhampton he found a bottom-bracket similar to that used by Smith, except that it had only one rear neck instead of two. At Coventry, he says he found the newest form of bottom-bracket at the place of William Hosier, one of defendants' corroborating witnesses, and obtained possession of it. He took it to his father's place at Wednesbury, and made a wooden pattern from it, changing the angle of the two rear necks or lugs from 45 degrees to 20 degrees above the horizontal. From this wooden pattern he caused to be made brass patterns, and two castings from each brass pattern. Defendant's exhibit "malleable cast bottom-bracket" is, he deposes, a substantial reproduction of Hosier's device. Defendant's exhibit "white metal cast bottom-bracket" is, he testifies, a substantial reproduction of the bracket cast from the brass patterns. Defendant's exhibit "pattern of bottom-bracket" is a substantial reproduction of the brass patterns, he says. These bottom-bracket patterns and castings he says he brought to this country as early as February, 1885. He exhibited them to a number of people, and took them to Smith shortly after the inauguration of President Cleveland. Thereafter, he worked nights for a week constructing a drop-frame in Smith's shop, using one of the brass castings. Smith was present, but did nothing toward the construction except to work the bellows, etc. Gould was an expert brazier. He simply embodied what he had seen in England, and never considered there was any invention. Smith suggested taking out a patent for the frame, but Gould thought it too old and involving nothing more than mechanical skill. He received no pay for his work. More than 30 witnesses have corroborated Gould's testimony in important particulars, among them the above-named Hosier, and the widow of the patentee. In addition, the record shows many corroborating coincidences, the recital of which would unduly expand this opinion. They all leave an impression of truthfulness. This evidence is controverted by a brother of Smith, who flatly denies Gould's statement as to the construction of the frame, including the bottom-bracket. It is also in evidence that Gould offered to testify for complainant for a consideration of $50,000, which was, of course, rejected. An attempt is made to show that, at the time this offer was made, Gould was suffering from a mental disorder. Notwithstanding Gould's later obsession, the above statements, so far as they are corroborated, are reasonably convincing, and are deemed worthy of consideration for purposes of disclosing the state of the art at the time the patent was applied for. In support of its contention that the device of the patent in suit was made public and known in this country prior to the alleged date of invention, defendants introduced a number of publications showing bicycle parts

and bicycles. These were published in England, but were circulated in the United States as above stated. Attention is called to certain notices so published in 1887. Among others, there is produced the Rover type of bicycle. This bottom-bracket depended somewhat below the frame as Smith says his may. It is rigid and integral. The tube is cut away between the two end bearings. It lacks only the bracing effect of the tube walls between the bearings, and what little advantage exists in protection from dust. It is, as defendants' expert says, a mutilated tube. It is provided with a tubular sheet metal cover between the bearings, to exclude dust and the like. The transverse tubular pedal shaft was old. It appears in the patent to Latta, No. 360,101, granted March 29, 1887, on application filed February 12, 1886, and in a number of patents cited in the record. It is complainant's contention that nothing short of a closed tube-bearing or bottom-bracket anticipates the patent in suit; that any appreciable opening or perforation in the walls of the tube differentiates from its tube. Defendant's expert Wiles was of the opinion that the Rover frame constituted a complete anticipation, and that the complete tube involved nothing more than mechanical skill. The rigid, integral bracket is also shown in British patent No. 4,657 of 1878 to Starley for a tricycle, etc. This patent calls for a reach forged with a socket to receive the pedal crank-shaft. It will be seen that with the exception that claim 1 calls for a specific style of bicycle—a requirement which, as above stated, is no essential part of the invention—this tricycle bottom-bracket comes very close to, if it is not in fact, an anticipation of that claim.

The bicycle design cut shown on pages 12 and 13 of the publication, Griffin Yearbook, 1887, and called "The Ranger Centaur Dwarf Safety Ranger," shows a bottom-bracket in rigid connection with the reach, but having a tubular journal or transverse tube underneath the reach. The Ranger (not the dwarf ranger) shown at page 8 in the Centaur Cycle Co.'s catalogue for February 1, 1888, is accompanied by the following statement in said publication, viz.:

"We produce in one solid steel forging the crank-bearing bracket with connections for the bottom fork and main backbone."

Complainant's expert says as to this bottom-bracket:

"It is not stated what these connections are nor whether the crank-bracket is tubular. It might have been partly cut away for the sake of lightness, according to the ideas then generally prevalent or clamped connections of some kind might have been used."

The cut of the Ranger shown with the advertisement discloses a tube so far as the bearing is visible. This of itself would show absolutely a tube that was so nearly tubular all the way through as to be sufficiently guarded against wrenching out of alignment. It seems like a straining of the evidentiary effect of the cut, to say that the transverse tube may be cut away or perforated. The cut shows the tube to be centrally between the forward and rearward portions of the reach, and might well be taken for an illustration of the bicycle in suit.

The nearest approach to a complete anticipation and publication and disclosure of the principles of the device in suit will be found in the

Raleigh bicycle. These are shown in the Bicycling News of February 4, 1888. Illustrations of this bicycle show beyond question a rear-driving, front-steering bicycle, having what seems to be clearly a tubular bearing-support centralized between the reach and the rear forks of the machine, substantially as shown in the patent in suit. The forward end is plainly shown to have been brazed to a lug on the bracket. The diagonal strut or brace forming the seat-post of the Smith patent is not shown, but this omission is admittedly immaterial. In Sturmey's Handbook (which is stipulated to have been published to the bicycle trade on July 20, 1887, and to be a standard publication) is found the following descriptive matter in reference to Raleigh bicycles:

"Crank-bracket constructed solid with the frame;" "solid crank-bracket impossible to work loose."

There seems to be a concurrence of the experts who have testified in this case that "solid with" means substantial integrality. In corroboration of this view, we have the description of the rear-fork adjustment as "slotted fork end and screw adjustment"—showing that the chain adjustment of the rear wheel was made through slotted ends of the rear forks (as of course it must have been if there was substantial integrality of the crank-hanger with the frame). This reasoning also applies to the Ranger and other designs above named. The brazing of the lower end of the reach to a lug on the forward part of the bracket being plainly visible, there seems to be hardly a question, this being an old and well-known mechanical expedient, that the other parts of the tubular frame were also brazed to lugs on the bracket at their respective meeting places, and thus made "solid with the frame" as stated.

These cuts and descriptive matter make it clear beyond a reasonable doubt that the Raleigh safety, constructed mainly of tubing, had a centralized and rigidly built-in bottom-bracket. Whether the tubular axle-support was completely inclosed or imperforate does not appear from either descriptive matter or illustrations. So far as visible, this device was imperforate. What was on the under side is not shown. For all that is there shown it may have been partly open or perforated. As above stated, complainant insists that the word "tube" in the claim should be strictly construed to mean a completely inclosed or imperforate bearing-support, and that as this published showing of the Raleigh bicycle does not show that this axle support was not perforated it cannot be sufficient as a publication to invalidate the patent. The law as to what is a sufficient publication is laid down in Seymour v. Osborn, 11 Wall. 516, 20 L. Ed. 33, as follows:

"Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use."

This statement of the law is found reiterated in Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064.

The question is whether this published showing of the Raleigh bicycle is such a "substantial representation" of the patented device as would enable "any person skilled in the art * * * to make, construct, and practice the invention to the same practical extent as he would be enabled to do if the information was derived from a prior patent." With these illustrations and descriptive matter of the Raleigh bicycle before him, showing every detail of the claims in suit except whether or not there was a perforation or opening in the under side of the bracket, and with both perforate and imperforate axle-supports to choose from, it is the opinion of the court that any person skilled in the art could as certainly have produced a bicycle involving the subject-matter of the claims in suit as if he had the Smith patent before him. If he chose a perforated axle-support and found that it was objectionable, it is believed that, in view of the state of the art, the most ordinary mechanical skill would tell him to close the opening or adopt an old form of imperforate tube. With the state of the art in view, it is the opinion of the court that there was no patentable difference between the Smith bottom-bracket with a perforation in its under side and a bracket of the same construction without a perforation. This brings the case within the rule stated in Chase v. Fillebrowne et al. (C. C.) 58 Fed. 374, "* * * That if the prior publication contains an omission which would ordinarily be supplied by one skilled in the art, the omission will not avail a subsequent patentee"—citing Cohn v. Corset Co., 93 U. S. 366, 23 L. Ed. 907; Downton v. Milling Co., 108 U. S. 466, 3 Sup. Ct. 10, 27 L. Ed. 789. The claims in suit were evidently allowed by the examiner on the theory that tubular brackets were new—that the depending forked bracket represented the prior art.

Complainant's expert insists that the language of the specification at lines 67 to 70, p. 2, above quoted, does not apply to claims 1 and 6, and that the bottom-bracket before the court must be integrally constructed in a direct line with the forward and backward extending axes of the reach. He does not advise the court as to what other claims of the patent this language appertains. When we consider that the end to be attained by his device was the strengthening of the frame without increase, but rather with a decrease of weight, it would seem that this position is an afterthought of the expert, and not in the mind of the inventor at the time he filed his application. It appears from the record that for several years preceding the date of the filing of the application for the patent in suit, the bicycle world was very active, with England as its center. The safety bicycle had been reduced to practical shape.

Of the close commercial relations, the interchange of publications, as well as personal intercourse between individuals of this country and England, the court will take judicial notice. As above stated, there is also before the court the fully corroborated testimony of Gould as to his trips to and fro between England and this country, and his intercourse with manufacturers and dealers on both sides of the ocean. There can be little doubt at a time when the bicycle was becoming a

craze that manufacturers and dealers in this country keenly watched, quickly adopted, and closely followed every advance in the art on the other side of the water, for England at that time was acknowledged leader in bicycle manufacture. Indeed, we have direct evidence that this was the fact in the testimony of Mr. Kirk Brown, one of complainant's witnesses. The admission, therefore, that the subject-matter of the Smith claims in suit was in common use in England during the years 1886 and 1887, nearly three years before Smith's application, raises a strong presumption that some of the English machines may have found their way here, or have been copied by manufacturers in this country. The fact that English manufacturers had generally adopted the form of construction shown in the Smith claims in suit without evidently considering the change of sufficient importance or novelty to patent, also throws an important light upon the condition of the art at that time.

It follows that the patent is not valid, and cannot, in the light of the evidence as to the prior art, be sustained. The bill is dismissed for want of equity.