### INGERSOLL et al. v. BETHLEHEM STEEL CO.

### FRANKLIN RY. SUPPLY CO. v. SAME.

### LOCOMOTIVE BOOSTER CO. et al. v. SAME.

Nos. 4645, 4647, 4649.

District Court, E. D. Pennsylvania.

Oct. 13, 1932.

Edward H. Davis, Harvey L. Lechner, and Paul Synnestvedt, all of Philadelphia, Pa., for plaintiffs.

Charles Neave and Clarence D. Kerr, both of New York City, and Howson & Howson, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

There are ten patents in suit, all relating to an auxiliary steam engine, commonly called a "booster," designed to furnish additional driving power, when required, to a steam locomotive. For convenience they may be divided into two groups. Four patents, constituting the first group, have to do principally with the means by which the engineer controls the operation of the booster, and may be called control patents. The remaining six patents relate to the construction of various parts of the booster and are referred to as structural patents.

### The Control Patents Generally.

The control patents, identified by descriptive names, are as follows: Ingersoll, No. 1,547,155, steam actuated entrainment; Ingersoll, No. 1,339,395, dual control; Ingersoll, No. 1,383,633, sequential control; Peters reissue, No. 16,483, preliminary entrainment steam. A number of the claims of the first three of these patents were in suit in Inger-

soll et al. v. Delaware & Hudson Co. (C. C. A.) 37 F.(2d) 465, the opinion in which case may be referred to for such details of the patented devices as are applicable to this discussion.

The idea of combining with the main driving means of a locomotive an auxiliary propulsion unit for use in starting and on grades is very old, dating back at least to Cathcart's patent of 1849. A condition, constant in all types of the device, has been that the auxiliary was to be operated by excess steam from the locomotive boiler and therefore could not be used when the locomotive was running at high speed using all its steam. Another condition, present in many types, was that the auxiliary driving wheels were smaller than the main driving wheels, and therefore, in those types, the auxiliary motor, if continuously engaged with its driven axle, would be badly racked at high speeds. Since the booster could not be used continuously, some method or system for putting it into operation and cutting it out when desired has always been a major problem in the art.

Three general methods of meeting this problem have been developed, or at least experimented with:

(1) Some devices, of which Cathcart, No. 6,818, and Helmholtz, No. 516,436, are typical, carried the driving wheels of the auxiliary lifted clear of the track when not in use and lowered them when auxiliary power was needed.

(2) In devices of the type of Sturrock, No. 40,715, Friermood, No. 870,769, Henderson, No. 1,013,771, and Coapman & Ettenger, No. 1,236,910, the auxiliary driving means are really duplicate main driving means, entrained (but not driving) at all times when the locomotive is in operation, driving steam being supplied to the auxiliary motor only when desired. Locomotives of this type are generally known as "multiple locomotives."

(3) In the remaining mechanisms the auxiliary motor is completely disengaged from its axle and wheels when not in use, the latter at such times functioning either as weight carrying wheels or guides. This type includes Creuzbaur, No. 173,164, Mallet & Behr, No. 389,232, Liechty, No. 970,512, Evans, No. 1,136,947, Liechty (German), and Holt (British).

The plaintiffs' control patents, as well as the defendant's device, belong to the third class which, as may be readily seen, represents an approach to the problem fundamentally different from that of the two other classes.

All the structures of this class require means of some kind for operatively connecting the motor with the axle which it is to drive. In all of them there can be found in one form or another the following instrumentalities: (a) The main driving means of the locomotive, and (a') the controls for the same consisting of the main throttle and reverse lever. (b) The booster motor, and (b') the means by which the same is started or stopped by controlling its supply of steam. (c) Mechanism for establishing operative connection between the booster motor and its driven axle, properly referred to as entrainment mechanism, and (c') control for the entrainment mechanism so that the engineer may engage and disengage the booster at will. The controlling devices for the locomotive, the booster motor, and the entrainment mechanism are not always separate, but in some types have been combined, as, for instance, in the defendant's structures, in which the starting of the booster motor also effects entrainment and in which, consequently, the same control governs both operations.

The combination of the elements noted above was old in the art when Ingersoll began to develop his control patents, and he has not produced anything patentable in the auxiliary motor or its control, nor in the entrainment mechanism itself. The point at which patentability is to be found, if anywhere, in these control patents, is in the *control* of the entrainment mechanism.

The history and relationship of the three Ingersoll control patents may be briefly adverted to because of its bearing upon some of the defendant's contentions. Ingersoll appears to have started off in his original application with an idea covering the entire booster installation but without any thoroughly developed scheme of control for the entrainment mechanism, except that the application clearly contemplated control by steam only. He then, evidently, worked out a dual control system, using steam and compressed air, ultimately embodied in patent No. 1,339,395, made separate application for it, and, by transferring all the control claims of the original patent to it, temporarily left unclaimed and indefinite the control system of the original application. Shortly thereafter it was probably determined to reinstate the control mechanism as a feature of the original application. This was done by a third or divisional application which resulted in patent No. 1,547,155. However, the control mechanism so reinstated carefully excluded the supposed improvement of dual control, then included in patent No. 1,339,395, and was confined to what it had originally been (though specified in the divisional application with greater definiteness)—control of the entrainment mechanism by steam only.

In view of this history, the defendant's contention that the reassertion of the steam control claims in the course of the application was not permissible because it involved an undue expansion of the original claims cannot be sustained; nor do I find double patenting in the two patents, No. 1,547,155 and No. 1,339,395, except possibly in claim 16 of the former, which will be dealt with later. The scope and purpose of the two are obviously entirely distinct.

### The Defendant's Structures.

The alleged infringing device manufactured by the defendant presents the same general combination of major elements—main driving means, booster motor, and entrainment mechanism with their controls—as appears in the plaintiffs' patents as well as in the prior art patents of the third class. There are two forms. In both, however, steam starts the booster engine and, in the initial movement of its piston, the gears, by which the booster engine and the axle of the tender are to be connected, are thrown automatically into mesh. After being so engaged, the booster engine drives the axle and its wheels. The defendant has added a second throttle or booster throttle to control the supply of steam from the locomotive boiler to the booster cylinders. In its first form the booster throttle admits steam to the booster cylinders regardless of whether the main throttle is open or the main driving means of the locomotive are operating. In the second form steam will not pass to the booster engine unless the main throttle is first opened.

The whole arrangement is comparatively simple. The reverse lever of the locomotive has absolutely no control of or effect upon the movement of the booster. There is no separate mechanism for entraining the auxiliary driving apparatus, nor are there any of the elaborate devices of the plaintiffs' control patents designed to secure sequential operation of entrainment mechanism and booster motor or preliminary actuation of the booster. When the booster cylinders start, the apparatus goes into gear with the axle which it is to drive.

It is possible that the defendant sacrifices something to simplicity of construction. Its booster can only operate in one direction—forward—and it may not always engage with

perfect smoothness. The testimony is that when the gears entrain "they go in with a bang." But we are concerned with infringement, not comparative efficiency.

### Ingersoll, No. 1,547,155—Steam Actuated Entrainment.

Taking up the patents of the control group separately, Ingersoll, No. 1,547,155, logically comes first. Claims 16, 19, 34, and 36 are in suit. Attention should be directed to the entrainment mechanism.

Unless "means controllable by said throttle lever" of claim 16 be limited to steam actuated means, the claim obviously will be entirely too broad to stand against the prior art, including Ingersoll, No. 1,339,395. The other three claims in suit all specify in terms a steam actuated entrainment mechanism.

Many of the prior art references cited against these claims fail to disclose a steam actuated entrainment mechanism.

Creuzbaur's entrainment mechanism is a clutch. It is operated by mechanical means —a rod which also opens the booster throttle to admit steam into the booster motor. The movement into gear of the clutch does not depend upon the booster being operated and is not accomplished by steam from the boiler or controlled by the main engine throttle. In Mallet & Behr entrainment is effected through a friction clutch of a special construction, but its operation is purely mechanical by means of a spindle and is entirely independent of the booster motor and its control as well as of the main throttle of the locomotive. Evans' entrainment mechanism consists of a set of gears, but they also are shifted by mechanical operation and are not dependent upon the booster steam or the controls.

There remain, however, the Holt British patent of 1876, the two Liechty patents, and the German publication of 1916 in "Organ fuer Eisenbahnwesen."

In the Holt patent the entrainment mechanism consists of chains which move a pivoted arm to throw a jaw clutch into gear. A steam-actuated piston by turning a sprocket wheel gives the initial pull to the chains. The steam comes from the cylinder of the auxiliary motor, which must be started first or at least simultaneously. True, it is only remotely controllable by the main throttle lever and hence probably does not anticipate claim 19. But its entrainment system is "controlled and operated solely by the pressure influence of steam" and is "initially actuated under the pressure influence of the steam" just as truly

as the plaintiffs' device, and therefore, unless claims 34 and 36 can be limited by the disclosures of the patent, the Holt patent will invalidate them.

The plaintiffs say that the Holt device has never been and could never be used in practical operation; and the antiquated structure shown in the drawings, as well as some rather curious features of the patent wholly unrelated to the entrainment mechanism, lend plausibility to the argument. But Ingersoll in his original application suggested "gears, *chains* or belts" as suitable driving connections and, in view of well-known usage, it cannot be held that a clutch operated by a chain connection is necessarily unworkable.

The Liechty American patent, No. 970,512, shows a disengageable booster with a clutch for effecting entrainment but, as he expressly states in his specification, "no means are herein shown for operating the clutch." This element is also lacking in the Liechty German patent. Otherwise, these two patents have many features like Ingersoll's.

The German publication referred to describes several different motors designed under what it refers to as the "System Liechty." One of them is substantially the auxiliary motor and locomotive of the Liechty patents. A drawing is reproduced which shows disengageable gears connecting the auxiliary propulsion device with its driven axle. The article says that the drive of the truck axles "is disconnected on level or sloping portions of the road when the cylinders of the auxiliary drive mechanism are not fed with steam, because the steam piston operating the disengaging device is connected with its chest."

It is not easy to say from the agreed translation whether the description of the locomotive and auxiliary refers to an engine in actual use or to a design for one, but the view of the plaintiffs, that a design for a proposed engine is described, may be accepted. The question still is whether the prior publication is in such full, clear, and exact terms as to enable any person skilled in the art to construct the invention to the same practical extent as he would be enabled to do if the information was derived from a prior patent. This is the rule laid down in Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33, and followed in Cohn v. U. S. Corset Co., 93 U. S. 366, 23 L. Ed. 907; Downton v. Yeager Milling Co., 108 U. S. 466, 3 S. Ct. 10, 27 L. Ed. 789; Eames v. Andrews, 122 U. S. 40, 7 S. Ct. 1073, 30 L. Ed. 1064; and many other decisions.

The publication unquestionably describes a steam-actuated entrainment mechanism; "steam piston operating the disengaging device" cannot well mean anything else. Further, the piston is motivated from the valve chest of the booster. The entrainment mechanism is also intended to be under control of the main locomotive throttle, because the article explains that the throttle for the auxiliary motor "is connected in the rear of the main throttle" (as in the defendant's second form) so that when the engineer wishes to disentrain the booster all he needs to do is to shut the main throttle "thus avoiding the necessity of having the engineer simultaneously work two throttles." This meets the requirement of claim 19 that the steam actuated entrainment mechanism be "controllable by said main throttle lever." It was not necessary to describe the part of the mechanism used to make the direct connection, since there were plenty of forms (clutches, gears, etc.) well known in the existing art. The Liechty patents had specified clutches. The whole article with its drawings and its detailed description of the actually operating motortruck, built under the Liechty system in 1913 and applicable in part to the design for the locomotive described, all considered in the light of the existing patents, is quite explicit enough to be considered a part of the prior art, as against claim 19.

The Circuit Court of Appeals for the Second Circuit had claims 16 and 19 before it in the Delaware & Hudson Case, supra, and there held that these claims, in view of the disclosures of the specification and drawings, must be limited to steam-actuated entrainment mechanism having a double control—by the main throttle of the engine and the reverse lever. This conclusion was reached because the specification and drawings show a reversible mechanism with a valve (35 on Fig. 5 of the patent) which conditions the direction in which the booster is to drive its axle and which is positioned by the reverse lever of the locomotive. If this reversible mechanism is really an essential feature of the combination intended to be patented, the "means," "mechanism," or "device" for entrainment called for by the claims in suit must be construed to include it. The plaintiffs argue that the Circuit Court of Appeals misconceived the function of this device and that it is no more essential to the operation of the whole device than the governor, which all agree is unimportant.

■ The question as it was presented in the Delaware & Hudson Case was certainly a close one. On the one hand, where the specification sets forth the purpose of the invention, it is a legitimate argument that any structure not necessary to accomplish that purpose is negligible. On the other hand, general language of the patent claims should never be interpreted so as to transcend the limits of the real invention and, unless the specification clearly indicates or implies that some feature included in the combination is nonessential, such feature would usually limit the broad language of the claims. In the absence of any conviction that the decision of the Circuit Court of Appeals upon this point is wrong, I would be constrained by the rule of comity to follow it; but, as has been indicated, there is in this case another and more compelling reason for reaching the same conclusion, namely, the necessity of adopting this construction in order to save the patent from invalidity in view of the prior art, particularly the German publication referred to taken in connection with the Liechty patents.

Adopting, therefore, the view that the claims of this patent must be limited to a steam-actuated entrainment mechanism having a double control one element of which is the reverse lever of the locomotive, none of them are infringed by the defendant's device, in neither form of which the reverse lever has anything to do with the operation or control.

■ The plaintiffs argue that claims 34 and 36 can be sustained over the prior art, even if anticipated at all other points, by the fact that they refer to the booster as "an auxiliary propulsion *unit*." This, they say, implies a patentable advance over even a disengageable booster (with steam-actuated entrainment mechanism) which is attached to the locomotive frame as it is in the Liechty patents. This contention, however, attempts to read into the claims a feature which they nowhere even remotely suggest. Of course, we may always turn to the specification and drawings for guidance in interpreting the claims, but there must be something to interpret. The word "unit" does not carry with it the slightest implication of physical disassociation from the locomotive nor of any particular type of connection with it. The auxiliary motors of Creuzbaur, Evans, and Liechty are just as much units as that of the plaintiffs. The matter of physical attachment or separation from the locomotive frame is merely a question of kind and degree. To say that the word "unit" in the plaintiffs' claim implies a particular kind of attachment or support for the booster motor is pure fancy.

Ingersoll, No. 1,339,395—Dual Control.

■ The claims relied on by the plaintiffs are claims 30, 32, and 39. Here, as in the last patent (No. 1,547,155), the question of infringement depends upon whether or not, in view of the prior art and the inherent nature of the invention, these claims must be limited to a device which subordinates its entrainment mechanism to control by both the reverse lever and the main throttle (though not in the same manner as in the last patent.) It will be seen that the instrumentalities involved here are essentially the controls for the booster motor and for the entrainment mechanism. In addition, claims 30 and 32 specify a particular kind of entrainment mechanism—claim 30 in a general way that it shall be disengageable, and claim 32 more specifically that it shall consist of a train of gears. Claim 39 does not primarily involve the entrainment mechanism but delimits a certain relationship between the operation of the booster motor and the supply of steam to the main driving means.

Obviously, if these claims are to stand against the prior art, they must be considerably narrowed by the disclosure of the specification. All of the prior patents of the third class (described at the outset of this opinion as auxiliary engines with disengageable connections) respond to a literal reading of claim 30. These include Holt, Mallet & Behr, Liechty (both the American and German patents), and Creuzbaur. Claim 39, if read literally, would be fully met by some of these references, and in addition, since it does not call for a disengageable connection, by a number of those of the second class, in which the auxiliary motor is operated by steam only when needed but is always engaged with its driven axle. In claim 32 the essential feature, according to the plaintiffs' argument, is a "train of gears." The ordinarily accepted definition of "train of gears" does not exclude a series or set of two gears which may be operatively connected, and therefore this claim (literally read) is met by several earlier patents having disengageable gears for entrainment of the booster motor. Evans is one of these.

Therefore we may turn to the disclosure of the patent and, inasmuch as both the plaintiffs and the defendant have based arguments on its file wrapper history, we may at least have that in mind. The application which resulted in this patent was an offshoot from an original application which finally resulted in patent No. 1,375,293, the main feature of which was the support for the booster frame.

When made, it carried with it out of the pending application all of the claims for control of the booster motor and the entrainment mechanism. Manifestly the invention embodied in this patent centers around these controls. In conformity with the statutory requirements the applicant set forth a combination which he claims as his own invention. His main object, he says, is to equip the locomotive with a booster to drive normally idle weight carrying wheels without modifying the normal method of operation of the locomotive. This object is, of course, worked out through the details of construction of the booster motor itself and its frame and mounting upon the truck and axle. It was obviously intended that this feature would be carried to complete development in the further progress of the original patent application. The specification of this patent (No. 1,339,-395) says very little about it, and in fact closes by expressly disclaiming "the arrangement of the booster motor on the trailer truck or the structural features of the truck and motor *apart from the control system,*" with a reference to the pending original application.

On the contrary, after stating that "another object of my invention is to utilize air pressure generated by the main locomotive for the air brake system as a medium of control for the booster motor," the specification is entirely occupied with a description of the control system, featuring the idea of an automatic control through the media of air and steam by means of the usual controls (throttle and reverse lever) of the locomotive. When he comes "to particularly point out * * * the part, improvement or combination which he claims as his invention," he says: "So far as I am aware, I am the first in the art to control a booster * * * by the controlling devices and main driving mechanism of the locomotive, these being operated in the ordinary way. * * * By this dual control, I am enabled, etc."

All three of these claims were in suit in the Delaware & Hudson Case. Claims 30 and 39 were held by the District Court not infringed, that court being of the opinion that the claims basically depended upon the conventional throttle and reverse levers of the locomotive. Claim 32 was held infringed, but that decision was reversed by the Circuit Court of Appeals which held that the same limitations had to be read into claim 32 in order to save it from invalidity as an unrelated aggregation and in view of the prior art. I am fully in accord with this view and think that it applies equally to all three of the claims in suit.

The plaintiffs argue that the Circuit Court of Appeals was in error in saying that the combination could be sustained only by importing into it some relation between the main driving means and the booster through the main throttle and reverse lever, and point out that certain physical results of the co-operation of the booster, entirely independent of the manner of its control or entrainment, with the main drivers of the locomotive, are sufficient to establish a functional relationship between the two and make a combination. Even if this is true, and such combination can be found independent of the control, it is old. I see no reason why, in many of the prior art devices which have auxiliary motors, substantially the same results would not follow after the motors have begun to operate in co-operation with the main driving means. In other words, the only way to find a *new* combination in these claims is to read into them a functional relationship through the main throttle and reverse lever between the entrainment mechanism and the main locomotive. This is so obviously the whole purpose of the patent that it seems idle to argue for any other construction.

■ True, this means that these broad claims must be interpreted to include certain elements which are specifically included in other narrower claims, and the result will be to produce substantially duplicate claims. This, of course, the courts are reluctant to do and will not do "if it can be avoided," Whitaker v. Todd (C. C. A.) 232 F. 714, 719; but unless we do it here all three claims will be wholly invalid—a result which would make very little difference to the plaintiffs.

Ingersoll, No. 1,383,633—Sequential Control.

■ This patent is for an improvement over Ingersoll, No. 1,339,395, just discussed. In general its purpose was to make sure that which seems to have been somewhat uncertain in that patent, namely, that the booster motor should be fully entrained with its driven axle before it begins to operate. Claims 16 and 17 are relied on.

The plaintiffs argue that claim 17 is broad enough to cover any mechanism which puts the gears completely in mesh before *full* motive power is applied to the booster motor. They base this contention upon the difference between the language of claim 16 and claim 17. The former describes the mechanism as controlling means whereby the booster "is first operatively connected with the locomotive and thereafter supplied with *steam*." The latter says: "It is first entrained with the locomotive and thereafter supplied with *motive power*."

The point of the plaintiffs' contention becomes obvious when we examine the defendant's structure. In it, steam enters the cylinders of the booster motor before entrainment begins. The first movement of the booster pistons accomplishes entrainment. Thereupon the whole combination begins to work and helps drive the locomotive. Thus, entrainment occurs after the booster is supplied with steam, but before it receives its full motive power.

The defendant, on the other hand, argues that "motive power" in claim 17 means no more than "steam" in claim 16 and that both these claims must, in light of the concrete disclosure of the specification, be construed as calling for an, apparatus in which full entrainment is effected before any steam is admitted to the booster cylinders.

In the specification the inventor states that the object of the invention is "to insure the sequential operation of the clutch mechanism of the booster motor, and the opening of the throttle valve to admit steam thereto." The instrumentalities which this patent deals with are the two control devices, that of the entrainment mechanism and that of the booster motor. If the specification and drawings be examined, it will appear beyond all question that entrainment of the gears will be effected not only before the booster motor begins to operate but before its control functions. On page 4, line 44, it is stated: "The controller, however, cannot act to supply the *booster throttle valve motor* with air (1) until the entrainment of the booster is completed * * *." Then, it is perfectly clear that the air control circuit is so arranged that not the least bit of steam can get into the booster cylinders through the throttle until the gears are completely meshed. The inventor in further discussing his object says that it "is obtained by the clutch controlling means which blocks off the air pressure from the pilot valve for actuating the throttle until the clutch is in its full operative position, i. e., the gears are in mesh and the booster motor entrained to drive its axle. *When this operation is accomplished,* the air pressure is admitted to the pilot valve in readiness to operate said valve when the throttle of the main locomotive is operated to admit steam * * *."

If this were a broad invention, claim 17 might, in spite of the limitations of the disclosure, be entitled to a range of equivalents which would apply it to a structure admit-

ting steam, but not full motive power, to the booster motor before entrainment. But it is an improvement only, and a rather narrow one at that, upon the controlling means disclosed in the dual control patent, No. 1,339,-395, which is referred to in the specification.

I am therefore clearly of the opinion that the defendant's structure does not infringe either of the claims of this patent in suit.

### Peters Reissue, No. 16,483—Preliminary Entrainment Steam.

This patent was undoubtedly evolved by reason of the fact that, when the entrainment mechanism of the earlier patents was started, the gears might be found in a tooth to tooth position in which entrainment might be blocked or, at any rate, accomplished only after some difficulty and clashing. The patent provides for this contingency by adding to the earlier mechanism a by-pass valve which supplies the booster cylinders with just enough steam to rotate the driving gear and idler very slowly so that they will be moving a little when the entrainment mechanism comes into play to force them into mesh with the driven gear. Claim 12 is typical of the claims of this patent in suit and calls for "means for rotating the driving gear during the meshing operation whereby to insure positive and easy engagement of the said gears."

The patent deals with the controls of both the entrainment mechanism and the booster motor, and its disclosure clearly requires the introduction of steam into the booster cylinders in two distinct stages: First, sufficient to rotate the gears but not full operating power; and, second, the full driving quota of steam. The structure is a complicated one containing most of the features of the earlier patents and adding to them the by-pass valve referred to.

Assuming that the claim may be construed somewhat broadly to cover any control mechanism which first admits steam in small quantities to the booster cylinders following it with the full power of the driving steam, there are still required the two distinct stages referred to. The plaintiffs and their witnesses make this distinction quite clear by their references to "entrainment steam" and "driving steam" throughout.

The argument for infringement is based upon the design of the defendant's booster throttle valve. It is true that this includes a small pilot valve, but I think it quite clear that the purpose of this pilot valve is to relieve the pressure on the top of the valve and make the opening of the main valve possible or at least easy. Whatever its purpose, I am satisfied that it does not admit into the booster cylinders any appreciable advance quota of steam before the full motive power arrives. If it did the pilot valve might be taken as the equivalent of the plaintiffs' by-pass valve, but as it does not I cannot agree with the plaintiffs that the graduated control of the booster throttle valve afforded by the worm mechanism is the equivalent of the plaintiffs' apparatus for admitting steam during entrainment.

Moreover, the system of vents and relief cocks which the defendant has introduced into its construction would almost seem to have been purposely designed to prevent the very thing which the plaintiffs say occurs. At any rate, I think it would prevent it if it were otherwise possible.

### The Structural Patents Generally.

These patents with descriptive names which have been assigned them for convenience are: Ingersoll, No. 1,375,293, flexible support; Pflager, No. 1,357,928, rocking bearing for support; Peters, No. 1,539,270, crossover eccentrics and large crank-shaft bearings; Roberts, No. 1,600,427, splash lubrication; Roberts & Peters, No. 1,602,124, bed frame supports; Roberts, No. 1,647,146, stuffing boxes for piston and valve rods.

Although many of the claims of the patents call for the entire combination, it will be seen that most, if not all, of them are in reality for details only. Peters, No. 1,539,270, covers a certain arrangement of parts; Roberts & Peters, No. 1,602,124, is for a system of strengthening the whole structure; Roberts, No. 1,600,427, is a system of lubrication for the whole; the others are for various subordinate instrumentalities.

There is one general consideration which applies to all these patents. Probably in no branch of industry has more time and attention been devoted to the improvement of construction and engineering details than in the designing and building of railroad equipment, and what the Circuit Court of Appeals said in Hansen v. Slick, 230 Fed. 627, 632, is to be kept in mind in dealing with them. "Modern conditions have made high engineering and mechanical skill ordinary incidents in many industries, and such technical skill is to be regarded as the incidental advance of commercial pursuits. It follows therefore that such advance in the art as results from this skill the public is entitled to avail itself of as a fruit of mechanical growth and advance."

Ingersoll, No. 1,375,293—Flexible Support. Pflager, No. 1,357,928—Rocking Bearing for Support.

 These two patents are concerned with the means for supporting the frame of the booster engine upon the truck and axle of the locomotive. The Pflager patent is for a rather narrow improvement upon the Ingersoll patent and the two may profitably be dealt with together.

The general structure of the patents is a three-point support—two spaced bearings upon the locomotive axle at the forward part of the booster frame, and a third point of support further back, described in the claims in suit in the Ingersoll patent as "flexible" or "resilient." The Pflager patent provides additional means for making this bearing sliding and rocking so as to take care of slight vertical movements between the locomotive truck and the axle which would result in tilting the forward end of the booster frame up and down. The idea of three point support for auxiliary driving apparatus, with flexibility in the rear support, was old in the art, however, and in looking for a margin of patentability, we must turn to the details of the flexible support.

In the patents in suit this support is from below. The booster frame is carried primarily upon a spring resting upon the locomotive truck frame. Even in the Ingersoll patent there is a certain sliding relation between the booster frame and the truck, but Pflager provides for additional motion by means of a ball and socket which he introduces between the top of the spring and the booster frame.

The flexible support of the defendant's alleged infringing device shows a different structure. The booster frame is suspended from (not rested upon) the locomotive frame by means of a suspension bolt with a ball and socket joint at either end and plus a spring washer supporting the socket at the upper end. Broadly speaking, however, the instrumentalities, their respective functions, and their combined results are the same, and infringement of the claims might be found unless the prior art narrows them to the precise structure of his disclosures, and this, I think, is exactly what it does.

Without burdening this opinion with discussion of details, I have concluded: (1) That the Johnson patent, No. 702,655, of 1902, fully anticipates the flexible support mechanism of the Ingersoll patent under discussion; and (2) that the Wagenhals patent of 1906, No. 830,940, substantially covers the defendant's device and therefore stands squarely in the way of finding that it infringes the Pflager patent. To be a little more precise on this, the Wagenhals ball and socket construction is basically the same as the defendant's, and, if you call a movement of the ball in the socket in the defendant's structure a sliding or rocking motion, then the Wagenhals patent has the same thing. However, I think it quite evident that Pflager meant also to incorporate the sliding motion of the Ingersoll patent because his *bolt* obviously has room to respond to the vertical relative movements of the axle. In the defendant's structure there is no sliding movement relative to either frame, and the bolt merely works forward or back by means of the ball and socket. This is what happens in Wagenhals, and therefore the defendant does not infringe or, as an alternative, if we eliminate from Pflager the movement of the bolt in its aperture which he carried over from the Ingersoll patent, then he is anticipated as to this by Wagenhals.

 Undoubtedly the plaintiffs have apprehended the difficulties indicated in the foregoing, as well as the doubtful validity of both patents in view of the prior art unless some other element of invention could be imported into them. They therefore do not stress the mechanical construction of the flexible support but profess to find patentable novelty in its location.

They say that the rear flexible support has been placed approximately under the center of gravity of the booster engine and that this takes much of the pressure of the weight of the booster from the spaced axle bearings, a matter of considerable importance because it eliminates the danger of overloaded bearings "seizing" the axles in case the lubrication should be imperfect. All this may be true, but the trouble is that even if the location of the rear support were a patentable feature of the combination it is not claimed, nor is it disclosed nor even remotely suggested by the specifications, and this applies to both patents. The drawings do show it somewhere near the booster's center of gravity, but the only reference of any kind to it in the Ingersoll patent is the following sentence: "Considerable flexibility is needed on a trailer truck on account of the variation of movement of the journal boxes and truck frame, and to provide this required flexibility the base frame 7 is hinged or otherwise flexibly connected to the axle and supported on the truck frame transom by means of springs 10 (Fig. 4) arranged so that both upward and

downward movements of the motor frame are cushioned, permitting absorption of shocks due to road bed inequalities and to the labor of the booster engine." And in neither patent does the specification have a word to say about the location of the support. The Pflager specification is exclusively occupied with the mechanical details of the support and the Ingersoll patent with the general three point (one flexible) support idea. In fact, many of the claims wholly exclude the plaintiffs' theory. For example, claim 13 of Ingersoll, which he has selected as typical, calls for spaced bearings at one end of the booster motor and means "at the other end" providing a flexible support, etc. While the claims of Pflager do not mention the location, his specification states that his invention is designed particularly in connection with use of the booster motor shown and described in the Ingersoll patent.

The result of the plaintiffs' contention would be to expand certain claims of the Ingersoll patent (such as claims 16 and 17 which do not call for the flexible support at the end of the booster motor) and all the Pflager claims in suit so as to cover devices in which the rear support is placed near the center of gravity of the supported engine. I doubt that any invention at all could be predicated upon this feature, but certainly no such expansion of claims is permissible, particularly when its sole basis is the patent drawing.

I therefore hold that the claims in suit of Ingersoll, No. 1,375,293, and Pflager, No. 1,357,928, are not infringed by the defendant.

### Peters, No. 1,539,270—Crossover Eccentrics and Large Crank-Shaft Bearings.

The structure of this patent was developed, apparently, because it appeared that the crank-shaft bearings of the type A booster (the earliest built) were not large enough. The space available for the various parts of the booster was rather limited and not susceptible of any expansion. To increase the size of the bearings in this limited space, of course, involved an engineering problem. It was, however, quite an ordinary problem presenting no unusual difficulties. The obvious answer to it was a rearrangement of parts so as to give the bearings more room. This was about all that Peters did in the patent.

The eccentrics by which the valves of the booster cylinders were moved were originally located in line with the valve stems, which position placed them upon the crank shaft at a point where they necessarily restricted the size of the bearings. By means of a crossover (a perfectly well known and common engineering device), he placed the eccentrics on the outside of the connecting rods thus leaving room to increase the size of the bearings. This arrangement obviated the necessity of decreasing the width of the driving gear or changing the location of the connection through which the connecting rods drove the crank shaft both of which expedients would have been undesirable.

I find no evidence of invention in connection with this patent. The result which it obtains arises from the application of a degree of technical skill to be expected in trained mechanical engineers. I therefore conclude that all the claims of this patent are void for want of patentable novelty.

### Roberts, No. 1,600,427—Splash Lubrication.

### Roberts & Peters, No. 1,602,124—Bed Frame Supports.

### Roberts, No. 1,647,146—Stuffing Boxes for Piston and Valve Rods.

As to all these patents the defendant has raised the defense of prior public use by the plaintiffs and their customers more than two years before the application dates. This issue requires certain fact findings, and I find as follows:

In the latter part of May, 1920, the plaintiffs (or their predecessors in title) completed and installed on New York Central engine 3149 a booster which comprised substantially the structures of these patents. This booster was known as the type A booster and differed from the types subsequently developed by the plaintiffs in many particulars but not in the details covered by these patents. The locomotive so equipped was immediately sent to a convention of railway master mechanics in Atlantic City, in June, 1920, where it was exhibited. Thereafter it was put into service for experimental purposes on the West Shore Railroad and was so operated during the summer and fall of 1920.

Considerable trouble developed and road tests were conducted with this locomotive beginning in September of 1920. In January, 1921, the booster was removed and subjected to block dynamometer tests in the plaintiffs' shop for the purpose of discovering what improvements were necessary to eliminate the trouble. As a result of these tests an improved type of booster known as C–1 was produced which was placed upon the market in 1922. The C–1 booster showed an operating efficiency nearly double that of the A

booster. The present booster made and sold by the plaintiffs is known as the C-2 type and differs from the C-1 primarily in the slight changes which were made in the control.

While the tests referred to upon the type A booster were in progress and in the calendar year 1920, the plaintiffs accepted orders for boosters of the A type amounting to $223,000, covering upwards of forty boosters. These boosters, or most of them, where manufactured and delivered to the plaintiffs' customers prior to the application dates of the patents in question. Most if not all of those delivered were later recalled and rebuilt by the plaintiffs so as to conform to the C type. I think it may be fairly assumed that for some considerable period at least they were in service in the hands of the purchasers. In June, 1920, and subsequently in January, 1921, the plaintiffs advertised the booster for sale in the Railway Age.

In the light of the foregoing facts, it is impossible to sustain the plaintiffs' contention as stated by one of their witnesses that the booster did not pass out of the experimental stage until the C-2 booster was made standard in 1922, or even the contention that the public uses prior to the application dates of the patents, beginning June 22, 1923, were experimental and collateral to the development of the invention in its complete form.

There is no question about the rule stated by the court in Reo Motor Car Co. v. Gear Grinding Co. (C. C. A.) 42 F.(2d) 965, that use and even sales are not necessarily a bar provided they are merely a stage of the development of the invention in its complete form, and this rule might apply here if the booster with its controls and structural details all comprised one general invention which was being gradually worked out until the C-1 type was finally evolved. That, however, is not the case. The detailed patents here referred to (splash lubrication system, bed frame supports, and stuffing boxes for piston and valve rods), while parts of a combination, were for complete structures entering into that combination, and I have been unable to find any evidence that the type C-1 booster represented any advance over or modifying of these structures as embodied in the A type. From any point the whole record indicates that the sales were ordinary commercial transactions, and I so find.

As was well said in Monroe v. Bresee (C. C. A.) 239 F. 727, 728: "The machines may not have been perfect; the inventor and manufacturer may have intended to improve his booster; but the transactions were nevertheless not merely, or even primarily, an arrangement for trying out and testing the (booster), but were sales of completely operative machines. The machines were purchased, not in order to aid (the inventor) in his experiments, but in order to secure efficient (boosters) for actual use." I have slightly paraphrased the above and find it fully applicable to the situation in this case. See, also, Wende v. Horine (C. C. A.) 225 F. 501; Covert v. Covert (C. C.) 106 F. 183; and Mayer v. Mutschler (D. C.) 248 F. 911.

The prior use found above, together with the publication contained in the Railway Review of September 4, 1920, constitutes a complete anticipation of many of the claims of these patents. This is true of claims 1 to 6, inclusive, of the Roberts splash lubrication patent (No. 1,600,427) and all the claims in suit of the Roberts stuffing box patent (No. 1,647,146). As to the others, I am unable to find in them any inventive advance over the structures of the type A booster. No doubt they represent improvements, giving the device, in some cases greater strength and in others increased efficiency; but when we consider the degree of engineering and mechanical skill which represents minimum expert qualifications in the field of locomotive designing, it cannot be said that such changes as have been made are anything beyond normal development to be expected.

### Summary of Findings and Conclusions.

#### Ingersoll, No. 1,547,155.

1. In claim 16, "means controllable by said throttle lever" must be construed as limited to steam actuated means.

2. Claims 16, 19, 34, and 36 are limited to devices having steam-actuated entrainment mechanism with double control one element of which is the reverse lever of the locomotive. As so limited, these claims are not infringed by the defendant's structure.

3. The claims in suit are not an undue expansion of the claims of the original application of this patent. There is no double patenting in relation to Ingersoll, No. 1,339,395.

#### Ingersoll, No. 1,339,395.

1. Claims 30, 32, and 39 are limited to devices in which the entrainment mechanism is under the control of both the main throttle and the reverse lever of the locomotive.

2. The "train of gears" of claim 32 does not necessarily mean more than two gears and

may be anticipated by devices having two gears only.

### Ingersoll, No. 1,383,633.

1. Claims 16 and 17 are limited to devices in which entrainment is effected before the booster motor begins to operate. As so construed, these claims are not infringed by the defendant's devices.

### Peters Reissue, No. 16,483.

1. Claims 11, 12, 13, and 16 contemplate a structure in which steam is admitted into the booster cylinders in two distinct stages: First, in small quantities insufficient to drive the motor but sufficient to effect entrainment; and, second, full driving steam.

2. The defendant's booster does not admit steam into the booster motor in distinct stages, but a single admission of steam drives the motor and effects entrainment.

3. The pilot valve of the defendant's booster throttle is not the equivalent of the plaintiffs' by-pass valve.

4. The defendant's system of vents and relief cocks prevents steam entering the booster cylinders until it arrives in sufficient quantities to drive them.

### Ingersoll, No. 1,375,293.

1. Claims 12, 13 to 18, 20, and 22 are anticipated by Johnson, No. 702,655 and are invalid.

### Pflager; No. 1,357,928.

1. Claims 1, 2, 3, 6, 7, and 8 are not infringed by the defendant's structures. If construed to cover the defendant's structures, these claims would be invalid for want of patentable novelty over Wagenhals, No. 830,940.

2. None of the claims in suit of this patent nor of the preceding one cover a flexible support located approximately at the center of gravity of the booster frame.

### Peters, No. 1,539,270.

1. Claims 1, 2, 3, 4, 5, and 6 are invalid for want of patentable novelty and invention.

### Roberts, No. 1,600,427.
### Roberts & Peters, No. 1,602,124.
### Roberts, No. 1,647,146.

1. The claims in suit of all these patents are invalid by reason of prior public use and prior publication.

The bill may be dismissed, with costs.