## DOWNTON *v.* YEAGER MILLING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Decided May 7th, 1883.

*Patent—Printed Publication.*

1. The doctrine reaffirmed that the earlier printed and published description of a subject of a patent which is put in evidence to invalidate a patent must be in terms that would enable a person skilled in the art or science to which it appertains to make, construct and practise the invention as completely as he could do by the aid of information derived from a prior patent; and that unless it is sufficiently full to enable such person to comprehend it without assistance from the patent, or to make it or repeat the process claimed, it is insufficient to invalidate the patent.
2. Applying the doctrine to this case, the appellant's patent *held* to be void.

The appellant was the complainant in the circuit court. He filed his bill to restrain the infringement by the appellee of certain letters patent, for which he made an application on March 20th, 1875, and which were issued to him on April 20th following, for an "improvement in processes of manufacturing middlings flour."

The state of the art, and the purpose of the improvement which the patent was intended to cover, were set forth in the specification, as follows:

"This invention has for its aim the better working or manipulating of grain particles known as middlings, for their reduction into meal or flour.

"To fully set forth the advantages that this process possesses

over any of the various processes previously known and in use, it will be necessary to previously describe the manufacture as now practised.

"It is customary under the ordinary mode of milling to separate and purify the middlings by the action of air alone, or air and bolting-cloth combined; then to convey the purified product to millstones to be ground to a sufficient fineness to admit of the passage of the middlings flour through the meshes of the bolting-cloth, which is used as a finishing-preparer between the stones and the flour barrels or sacks receiving the finished product. In some cases the middlings that are not sufficiently reduced to go through the meshes of the cloth, pass through the ends of the flour-bolts, and are brought back into some of the various purifiers, and subjected to repurification. This process requires much careful manipulation, and even then the yellow germ and pellicle of the grain will be so torn and pulverized by the stones that loose portions of the same will pass through the meshes of the bolting-cloth, into the flour, with injurious effect. The reason why the germ and pellicle is so torn is that millstones are composed of two disks—one revolving, the other stationary—receiving the material to be ground at the eye or centre of the stones, and compelling it by centrifugal force to escape at the skirt or periphery of the stones, passing alternately over face and furrow until it reaches the periphery, where it is discharged. Such action comminutes the germs and forms specks that cannot be removed by the purifiers, and are, therefore, ground in with the flour.

"In the manufacture of middlings flour the action of stones on the middlings is not different from their action on grain, but in the wheat-stones the germ ends and bran are not sufficiently comminuted by one grinding to pass through the meshes of the cloth used for the flour known to the trade as 'first run.' I propose to arrest and remove such germ matter and bran particles by my improved process before they reach the second grind on the middlings-stones, by placing between the purifiers or separators and middlings-stones one or more sets of rolls, which will operate to reduce the large middlings by a bruising or crushing action, while they simply flatten out the intermixed germs and bran. Any of the various purifiers or separators in public use may be employed. A second important advantage or result of this improved process is the production of a large yield of high-grade

flour.   The large middlings or glutinous particles of the grain require more grinding than do the finer and more starchy particles removed at the head or first part of the purifiers ; and when ground together, as is generally the case with small mills, and frequently the case with large mills, the meal is considerably heated in the grinding, owing to the miller's requiring the middlings meal to be of uniform fineness.   The disposition and fineness of the small middlings cause them to 'flour' quicker than the large middlings, therefore the grinding is unequal, as, in order for the large glutinous middlings to be ground enough, the small starch middlings must be ground too much.   This impairs the quality of the flour by deadening it, as well as by reducing the germs and bran to such an extent as to cause them to pass through the cloth.   Some mills, therefore, run the coarsest middlings to a lower grade of flour.

"It is plain that with an intermediate reduction, by the flattening-rolls working on the large middlings as above set forth, the comminution of the middlings under the stones is rendered more equal, and a larger percentage of high-grade flour can be made.

"I will now describe briefly my mode of milling, referring, for illustrations, to the accompanying drawing, in which—

"Fig. 1 is a general side view, partly in section, showing an apparatus, or a series of machines, comprising a section of my purifier A ; and Fig. 2 is a like view of the same apparatus, in part, illustrating the employment of any other purifier, A².

"Naturally the germs and bran are kept with the large and valuable middlings or particles of grain by the bolting-cloth of the purifying machines or flour-bolts till they reach certain parts, where the middlings are subjected to strong currents of air to remove light bran-flakes and fuzzy matter.  The partially-freed middlings are now passed from the purifier A, or A², between rolls or uniformly rotating surfaces, B, where the good middlings particles, being more brittle, are reduced to small granules, or to flour, while the germ and heavy bran matter, being of a soft, plastic nature, is flattened out, so that on passing it into a reciprocating or revolving bolt, C, clothed with suitable cloth, the flouring matter is thoroughly removed through the meshes of the cloth in a fit state of purity to pass to the stones D to be reground as usual, and the injurious germs and refuse matter are arrested, so as to be run off into suitable receptacles."

The claim was stated as follows:

" The following is claimed as new, namely :

" The herein-described process of manufacturing middlings flour by passing the middlings, after their discharge from a purifier, through or between rolls, and subsequently bolting and grinding the same for the purposes set forth."

The answer of defendant set up, among other things, as matter of defence, want of novelty, and vagueness and uncertainty in the specifications and drawings filed by the patentee to describe his invention.

The circuit court sustained both these defences and dismissed the bill. The complainant appealed.

*Mr. Geo. Harding* and *Mr. W. G. Rainey* for appellant.

*Mr. F. W. Cotzhauser* and *Mr. Robert H. Parkinson* for the appellee.

Mr. Justice Woods delivered the opinion of the court.

A grain of wheat may be described generally as follows: It consists of a pellicle or outside covering known as bran, an inner envelop consisting of cells and their contents of gluten and phosphates, the most nutritious portion of the berry, and an interior white mass composed mainly of starch and albuminoid matter, extending to the heart of the berry. At one end of the berry, under an irregularly-curved surface layer of bran, technically called the shield, is the embryo or germ. The germ is a yellow, waxy substance, and the bran is consistent and tough. It has always been the aim of good milling to separate as completely as possible the bran and germ from the other contents of the berry, because they not only gave color to the flour, but rendered it more liable to sour.

The main purpose of the improvement described in appellant's letters patent was to accomplish this result by removing the bran and germ from the coarse middlings, leaving only those parts of the grain from which pure white flour could be produced. The improvement consisted in a process, and did not cover the several devices by which the process was carried on.

The process was as follows: Coarse middlings, from which the fluffy matter had been eliminated by a well-known contrivance known as a purifier, were passed between one or more sets of rolls which reduced the large middlings to a greater degree of fineness, but flattened out the tough and waxy germs and bran. After the middlings, with the intermixed germs and bran particles, had been passed between the rolls, they were carried to a bolting-cloth. This allowed the comminuted middlings to pass through its meshes, whence they were carried to the stones "to be reground as usual," but the germs and bran particles having been flattened and their surfaces enlarged by the rolls, could not get through the bolting-cloth, and were carried to the end of the bolt, and then run off into suitable receptacles.

It will be observed that all the separate parts of this process are old. The use of purifiers on middlings to take out the fluffy particles, the use of rolls to comminute middlings, the use of bolting-cloths to separate the bran and germs from the flour, and the use of stones to regrind middlings, all long antedate the patent of the appellant.

The only field left for invention, therefore, was either a new order in which the different parts of the process were to be applied, or some new method of using some one or more of the devices by which the process was accomplished, or both these combined, so as to produce some new product, or some old product in a cheaper or otherwise more advantageous method. It is claimed for the appellant that his invention consists "in interjecting in the old modes, after the purifier, a pair of smooth rolls of equal diameter and running at equal speed, and then rebolting the product and regrinding the middlings" which pass through the bolting-cloth.

We are to inquire whether the defence relied on in this case, that the invention claimed as his own by the appellant, had been described in a printed publication before his invention thereof had been made out.

By section 24 of the act of 1870 it was provided that any person who had invented any new and useful art, machine, manufacture, or composition of matter not known or used by

others in this country, "and not patented or described in any printed publication in this or any foreign country before his invention or discovery thereof," might obtain a patent therefor.

In construing the words "described in any printed publication in this or any foreign country," as they were used in reference to the same subject in section 7 of the act of 1836, 5 Stat. 117, this court, in the case of *Seymour* v. *Osborn*, 11 Wall. 516, said (on page 555):

"Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, unless the description and drawings contain and exhibit a substantial representation of the patented improvement in such full, clear and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, and practise the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent."

So in *Cohn* v. *United States Corset Company,* 93 U. S. 366, Mr. Justice Strong, speaking for the court, said (at page 370):

"It must be admitted that, unless the earlier printed and published description does exhibit the later patented invention in such a full and intelligible manner as to enable persons skilled in the art to which the invention is related to comprehend it without assistance from the patent, or to make it, or repeat the process claimed, it is insufficient to invalidate the patent."

Applying strictly the rule thus laid down, we are of opinion that the defence of prior publication has been made out.

After a careful consideration of the evidence in the record, we are forced to the conclusion that the method of making flour set forth in the specification of appellant's patent was fully and clearly described in a printed publication before the invention thereof by the appellant, and that his patent therefor is consequently void. We refer to a German work put in evidence by the defendant, entitled Die Mehlfabrication, by Frederick Kick, published at Leipsic in 1871. We take the following extracts from a translation of this book.

" Part IV., Rough Grinding with Roll Mills :

" In the successive process of grit, or high milling, the grain is crushed in its first passage through between the stones, that is, broken into parts of different sizes—groats.

" In the disintegrating process which follows next, flour, dust, middlings, partings, and breakings are obtained. With each of these substances, classified according to size, particles of the hull of the same size are mixed, or still adhere to the particles of the grist. By this method of crushing with stones, a partial splitting up of the hull is unavoidable, and the flour obtained from such rough grinding is mixed with particles of bran, even from decorticated wheat, and is therefore discolored.

" If one were able wholly to prevent the disintegrating of the particles of the hull, the flour produced by rough grinding would be white.

" This, however, is never fully accomplished ; but there is, on the one hand, a way to diminish the friability of the hull —by moistening ; on the other hand many sorts of wheat, under similar treatment, exhibit this difficulty to a less extent, and therefore produce white flour, viz., soft wheat—or, finally, machines are employed which, in the process of rough grinding, break up the hull to a less degree, as is the case with roll mills.

" The roll mills operate partly by crushing and partly by grinding. They produce breakings, which then pass to the stones for grinding into flour. The surfaces of the rolls are smoother than those of the stones, and the hull is, therefore, less torn. Of course the disintegrating by means of rolls is not appropriate for every kind of wheat. If soft, mild wheat is passed through the rolls, it leaves the rolls in a flat, compressed condition, whereas, with the same treatment, hard (Hungarian), wheat is reduced to fragments, and so regularly broken.

" The action of the rolls evidently depends upon their relative position (their distance apart) ; it also depends on the condition of their surfaces (whether smooth or channelled) ; and then again on their relative motion, viz., whether both rolls have like or different velocities.

" If the rolls are so far apart that the wheat sustains only a moderate pressure, and if they are smooth, then only a breaking of the grain occurs in the direction of the crease. The berry is

thereby divided into two longitudinal halves, of which many still cohere at the back, thus resembling an open book.

"In case the rolls are closer together, then, with soft wheat a flattening takes place, and the middlings obtained therefrom are very clean or free from bran. Hard wheat is much more considerably reduced, and a proper breaking is effected. . . . Rolls with smooth surfaces operate more by compression—those with fluted surfaces more in a cracking or breaking manner. In order to give the rolls at the same time a triturating effect, they are made to revolve with different velocities.

"Two, three pairs of rolls may be arranged one above another. By the first pair 'coarse breakings' are produced; by the second 'first breakings,' etc. Hence, the application of three pairs of rolls permits a gradual disintegration during a single passage of the grain through the roll mill. . . . There are (as we shall explain hereafter) certain varieties of middlings in which the but partially broken germs constitute thirty or forty per cent. of the entire mass, and which being yellow granules, give to the entire mass of grist, with which they are intermixed, a yellowish appearance.

"Now, if this kind of middlings is passed through properly adjusted rolls the tough germs are only flattened, while the other granules are broken and can be easily separated by sifting. Instead of a pair of rolls, a single roll operating against an adjustable segment of stone or iron may be used. By this latter method the substance ground is much more subjected to trituration. The particles already reduced continue to rub against each other and against the working parts of the machine until they finally pass out, in consequence whereof the advantages above mentioned of the roll mills are greatly neutralized."

We have, in this publication, an accurate description of the process covered by appellant's patent.

We have the rolls used for the identical purpose therein set forth, namely, to reduce the middlings and to flatten out the germs, so that they can be separated by bolting or sifting, thus preparing the middlings to be again ground and reduced to middlings flour.

Appellant insists, however, that the process described by

Kick is not applied to purified middlings, and therefore differs from his.

But ·it appears, from the well-known state of the art, that ever since purifiers were invented, it has been the practice to purify middlings before reducing them, so that whenever the grinding of middlings is mentioned, graded and purified middlings are understood. The process of purifying, in case of gradual reduction, is as elementary as bolting, and follows every reduction of the material. When, therefore, Kick speaks of passing middlings through the rolls for another reduction, he must be understood to mean purified middlings. But the evidence in the record clearly shows that the action of the rolls, and their effect upon the product of the mill, would be the same whether purified or unpurified middlings, or even wheat, were used.

Appellant further insists that his process differs from that described by Kick, because the rolls mentioned by the latter run at unequal speed. This contention is founded on a misapprehension. The extract from Kick's work expressly says that "the action of the rolls evidently depends . . . on their relative motion, viz., whether both rolls have like or different velocities." Rolls, therefore, with the same or different velocities could be used in the process described by Kick. His method included both.

We are also of opinion that the process which appellant claims as his invention was also clearly described as early as the year 1847 in a publication called Anglo-American and Swiss Science Milling by Christian Wilhelm Fritzsch, published at Leipsic by Gustav Brauns. This description of the process of manufacturing flour is illustrated by drawings, which make it perfectly clear that the different parts of the process of the appellant were anticipated and publicly printed more than twenty-five years before the appellant, according to his own story, conceived the improvement described in his patent.

Fritzsch describes the process as follows :

"The advantages to be derived from the roll mill consist chiefly in this, that in operating them a considerable saving of power is

achieved as compared with stone mills.    Furthermore, the flour produced is of excellent quality, both in whiteness and fineness..

"Inasmuch as the wheat is ground in a dry state, the flour produced is especially adapted with respect to durability for transportation and storing.

"The principle on which all said improvements turn, centres wholly and exclusively in a desire to effect the grinding of wheat, so that not only the largest possible quantity of good middlings flour is obtained, but also that this may be separated from the hull or bran in its original purity ; or to express it in plainer words, to obtain the mealy interior substance without admixture of any part of the hull."


Then follows a description of the mill by which the reduction of the wheat to coarse middlings is effected :


"The rough-ground product discharged from the mill (in which, besides middlings, flour has been produced) is thereupon most conveniently carried into the upper stories of the mill building by means of an elevator, and is then first transferred to a flour cylinder for the purpose of separating the flour.    The remainder then goes upon a grit cylinder, where the material is assorted and separated from the hull in four different grades of middlings. The middlings thus obtained are thereupon likewise cleaned in the manner already described, and prepared for flouring.

"The grinding of middlings takes place by a manipulation varying but little from the process of rough grinding, by means of a flouring mill, which, together with the crushing mill above mentioned, constitutes a set or run.    We see this flouring mill upon our plate (fig. 8).    Its construction is in the main like that of the other, only the difference that the upper pairs of rolls are not fluted, like those in figure 7, but have smooth turned surfaces, and consequently no under layers (wedges).    This under layer (wedge), is only used with the under pair of rolls, which are finely fluted.

"The middlings ready for grinding are here also put into the hopper, as shown, and carried to the first, second, and third pairs of rolls, in the manner described.    The upper two pairs of rolls crush and triturate the middlings to the utmost degree ; there-

fore, it remains for the last lower pair of rolls to shake up the flour.

"This product, thus finely ground, is now transferred to the cylinder bolt for separating the flour. The bran-like surplus is carried with the hulls to a stone mill, to be very completely ground out.

"The grinding of middlings in the manner above described has many advantages in its favor—especially in this, that the hull particles still contained in the middlings are, by this process, not any longer decomposed or torn up, whereby the possibility of transfer of them into the flour is avoided."

In this description we have the purifying of the middlings by a purifier which is shown in the cut, then the passing of them between two pairs of smooth revolving rolls of equal diameter, which are in all respects like the rolls described in the specification of appellant's patent, and which necessarily perform the same function; then the disintegration, or shaking up as it is called, of the ribbons or sheets of the material which come from the second pair of rolls, by passing them through the third pair, which are fluted, but are not allowed to touch each other, and then their transfer to the bolting cylinder, by which the flour is separated from the bran and germs.

The only difference between this process and that described in appellant's patent, is that the last two sets of rolls but one, mentioned in the process described by Fritzsch, completely reduce the middlings to flour, while in the process under appellant's patent the middlings, after passing between the rolls and being separated from the germs and bran, are again ground between stones; but the great feature of appellant's process, the flattening of the germs and pellicle by passing the middlings between rolls, is found in the method described by Fritzsch.

The advantages from the process described by Fritzsch are identical with those claimed for the process described in appellant's patent, first, a saving of power; second, the hull of the wheat (and necessarily the germ), is not disintegrated and torn up in passing between the rolls as it would be between the ordinary millstones, and can therefore be eliminated by the bolt; and, third, the yield of high-grade flour is increased, and

the flour produced is of excellent quality, both in whiteness and fineness and fitness for transportation and storing.

The printed publications relied on to defeat the appellant's patent describe the process covered thereby so fully and clearly as to enable persons skilled in the art to which the invention relates, to carry on the process. In fact, the description of the process in the printed publications is, to say the least, quite as precise, clear, and intelligible as in the specification and claim of the patent.

The earliest date at which the appellant claims to have invented his improvement is stated by him as in 1872 or 1873. These publications, therefore, which antedate his invention, one by at least one year, and the other by twenty-five years, are fatal to the validity of the patent.

The decree of the circuit court which dismissed the bill must therefore be affirmed; and

*It is so ordered.*