## HALLIBURTON OIL WELL CEMENTING CO. v. SCHLUMBERGER WELL SURVEYING CORPORATION.

### No. 10063.

Circuit Court of Appeals, Fifth Circuit.

Sept. 5, 1942.

Rehearing Denied Oct. 12, 1942.

Leonard S. Lyon, of Los Angeles, Cal., J. Vincent Martin, of Houston, Tex., and Ben F. Saye, of Duncan, Okl., for appellant.

Worthington Campbell and Mark N. Donohue, both of New York City, and Brady Cole and Garrett R. Tucker, Jr., both of Houston, Tex., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Schlumberger Well Surveying Corporation, owner of Patents No. 1,819,923 and No. 1,913,293, which were issued to Conrad Schlumberger on Aug. 18, 1931, and June 6, 1933, on applications filed June 26, 1929, and Jan. 23, 1932, respectively, obtained a decree against Halliburton Oil Well Cementing Company sustaining Claims 1, 2, 3 and 4 of the former patent and Claim 1 of the latter, adjudging infringement, and awarding an accounting. On this appeal therefrom, the validity of each patent is challenged for want of sufficient disclosure, because the new and useful part of the patented processes is not clearly pointed out, because in view of anticipating patents and publications there was no invention; also infringement is denied; and unconscionable conduct disentitling the plaintiff to equitable relief is asserted.

Both patents relate to electrical investigation of strata traversed by fluid-filled drill holes, especially uncased oil wells. The earlier patent, referred to as the resistivity patent, deals with the resistivity of the strata to the passage of an artificially produced electric current. The later, referred to as the porosity patent, deals with the detection and measurement of electrical potentials spontaneously produced by fluids percolating in porous strata. The object of each is to obtain information about the nature of the strata reached or traversed by the mud-filled rotary drilled hole as it is bored and before it is cased with metal, by observing electrical phenomena, instead of by the old method of extracting mechanically cores from the strata for examination as to their texture

and contents, their chemical composition, the presence of fossils, and the like. It was also an old practice to keep "driller's logs", that is, a running record of the hardness and softness of the strata drilled, and the nature of the drilled material as it floated up out of the well as the boring continued at noted depths. The driller's logs were not very definite or reliable, and the mechanical coring was laborious and expensive, and sometimes endangered the safety of the well; while the cores were more often than not lost in the effort to get them out.

By the methods now used by the appellant and appellee, quite similar in results, though differing in some details and in the apparatus used as independently developed and improved by each, an "electric log" is made of a deep mud-filled well in a comparatively short time and at much less expense, which has been found to give valuable and reliable information about the strata reached. The electric log is a continuous graph photographically traced by the motions of electrical measuring apparatus as one or more electrodes are first lowered into the well, and then withdrawn from it, the "spontaneous potentials" being recorded at every depth on the down trip, and the "resistivity measurements" being recorded for every depth on the return trip. Three or more continuous curves are thus recorded alongside each other, the "kicks" or sudden changes in which indicate the passage at that depth from one stratum to another and give some information as to whether or not the stratum is porous; oil occurring only in the porous strata. Of course water also may occur, or saltwater, these fluids having an effect on the "resistivity" of the stratum in which they are, and also giving rise to "spontaneous potentials". The appellee and its predecessor began in 1929 an effort to make these electrical investigations about "resistivity", but without any commercial success, at least in the United States. In 1932, after the porosity patent was applied for, the measurement of the spontaneous potentials was added in combination. Alternating current was later substituted for the direct current indicated in the earlier patent, and many improvements in apparatus and method were made, so that better logs were produced and more quickly, and they came into favor. In 1936 Humble Oil Company, having a related patent, sought to pool interests with appellee and to obtain a reduced rate on the logging of its wells. This overture was rejected, and Humble turned to appellant, Halliburton Oil Well Cementing Company, and placed its patents and experts at the latter's disposal, and after much experiment and research they became competitors of appellee in the electric logging business. Appellee also by experiment and research made improvements, coming to own twelve patents in addition to the two here involved, relating to this art. Electric logs are now made for almost all rotary drilled wells, and are much used for information about them in ways not necessary to be stated in detail. In "proven territory", where hundreds of wells have been drilled and logs taken of them, so that the succession of strata, their depth and general thickness have been established, a *comparison* of the log of a new well with those of other wells indicates with fair certainty what particular stratum has been reached at a given depth. In "wild-cat territory", the curves on the electric log indicate enough to make a good guess at the nature of a particular stratum, especially as to its porosity, so that mechanical cores are taken only there, to add their information, so that decisions can better be made about the well. In 1939 appellee did a business of about $3,000,000 making logs in the United States. It was and still is doing through its own crews, or by its licensee, about 90% of the business, appellant doing the rest. Thirty-six experts employed by patrons testify as to the utility and present success of the logs, seeming to have no preference as to the logs made by one company over those of another. None of them know much about how the logs are made, or about the apparatus used. Appellee, it is proved, forbade its employees and engineers to disclose any details of its apparatus and methods, beyond what was shown in the patents and a few publications. The two competitors seem not to have known the details of each other's operations until disclosed in answer to interrogatories in this case.

■ Without doubt electrical logging as now done both by appellant and appellee has made a great practical stride in the oil well art; as is reflected by the commercial success of the logs. But so many refinements of method and improvements in apparatus have been made over the simplicities of the patents in controversy, that little weight can be given this commercial success in considering the merit of these patents. Neither patent practiced by itself would have had any success. The older patent was a commercial failure till combined with the second, and the combination made

little progress until both the processes and instruments were changed to eliminate inaccuracies in ways, some also patented, which greatly enhanced if they did not wholly produce the commercial success. Each patent must be examined on its separate merit. The question as to each is, Does it merit the monopolization of the present art of electric logging? But a validly patented method, however simple, may not be infringed, no matter what improvements have been added.

Resistivity Patent, No. 1,819,923.

Claim 2 of this patent is for an *apparatus* to determine the nature of geological formations traversed by drill holes filled with water, by means of electrodes in the water, with means of measuring an artificial current sent down, and the difference of potentials thus generated in the other electrodes, to deduce the resistivity of the earth at the depth of the electrodes. The claim by its general wording seems to embrace all possible means of so measuring the artificial current and the resulting potentials; but both had been measured for decades before. The claim so interpreted could not be sustained. It must be reduced to the apparatus or system described in the disclosure. But thus limited, there are disclosed only the usual and well known laboratory apparatuses, for which no patent could be granted, and in which no novelty is even asserted. The only possible novelty must lie in the concluding words: "Whereby the resistivity of the earth at the depth of the electrodes can be deduced", referring to a method of deduction next to be discussed.

The three other claims of this patent are *process* claims. Like the second claim they are of great breadth on their face, but must be taken as referring to the processes described in the disclosure. These, as we read the patent, center in the ascertainment of what the patentee terms the "specific resistivity" of the rocks traversed by the drill hole. Resistivity is the capacity to resist the passage of an electric current (being the correlative of conductivity), and "specific" means pertaining to a special material, as compared to some standard, in just the way we speak of the "specific gravity" or "specific heat" of a substance. Tables can be made, and have been made, of the specific resistivity of many homogeneous materials. The applicant for patent, after referring to mechan-

ical coring as tedious, says: *"The present process consists* in replacing mechanical coring by the measurement of the *specific resistivity* of the different rocks traversed. * * * I have discovered that the specific resistivity,* i. e. the resistance of a cylinder one centimeter in length and one square centimeter in section, is a parameter which sufficiently characterizes the different rocks, so that it is possible to deduct (deduce) the nature thereof from the figures obtained in the electric readings." After describing apparatuses and their use, not asserted to be novel and not so in fact, he gives a formula, in which the distances and electrical measurements observed are to be substituted for the symbols, concluding: "Which gives the required resistivity Rho." So the alternative use of another apparatus, and the formula for it, concludes: "From the value of $R_3$, it is then possible to deduce the desired resistivity of the earth, Rho." We cannot doubt that the teaching of this patent is, that with ordinary apparatus in a drill hole readings shall be made of electrical reactions, which are to be used in a formula to calculate the specific resistivity of the rocks or earth between the electrodes, and thus to determine their nature. No one now practices such a process. No one cares about the exact specific resistivity of any stratum. The evidence is that in actual practice the strata are composed of materials so unhomogeneous that specific resistivity cannot be affirmed of them. In the process of appellant in making an electric log a curve is traced indicating *variations* in resistivity in the strata penetrated at different depths, for comparison with logs of other wells, but no formula is used, nor any effort made to calculate specific resistivities. We do not consider this process to be that disclosed in the patent. There is no infringement, if the patent is valid.

But in view of the prior patents and publications, which we will not recount in detail, if this disclosure can be thought to include the registration of resistivity variations for comparison, without the use of a formula to calculate specific resistivities as a parameter to identify rocks, we should not think it sufficient. The statute, 35 U.S.C.A. § 33, requires the applicant for a patent to describe his discovery and "the manner and process of * * * using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art

* * * use the same * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." If this is not done the patent, though issued, is void. Grant v. Raymond, 6 Pet. 218, 8 L.Ed. 376; Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221; Permutit Co. v. Graver Corporation, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163. The only discovery this patentee distinctly points out that he made is that rocks have specific resistivities which characterize them and can be calculated. His patent monopoly can include no more. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34. The mere measuring and recording of electrical resistivities, and their variations, in strata in mines and wells have been practiced long before this patent was applied for, and Schlumberger himself had patents, now expired, for such processes in which the same apparatus here disclosed was used in the same way. The object there, however, was to test for mineral-bearing ores, in regions where the strata are much tilted and outcrop on the surface in succession. In oil exploration approximately horizontal strata are encountered, so that a vertical drill hole crosses the strata in succession much as the horizontal tests cross the tilted strata. There is hardly invention in the idea of using the same method and apparatus vertically that had before been used horizontally. Indeed some of the older patents were used vertically, and several publications discuss such use. We have grave doubt that there was any patentable novelty at all in Schlumberger's application to drill holes of these older practices, though we rest the case rather on the point that this patent does not particularly point out and distinctly claim anything that is novel, unless it be the definite calculation of specific resistivity, and if that be novel, it is not useful, and is not used.

### Patent No. 1,913,293.

The porosity patent is a *process* patent to locate and investigate porous strata only, which are of interest mainly because oil and gas occur only in such. It is based upon the well known phenomenon of electro-filtration, which is that an electrical force is generated by the passage of a fluid through a porous substance, the magnitude of which force is determined by the electrical character of the fluid and of the porous filter, and by the pressure under which the filtration occurs. The patent disclosure mentions, what was also well known, that other natural electric potentials are likely to be present, arising from chemical action or osmotic action, or earth currents due to local causes. The necessity of eliminating these other electrical effects, which are mingled with those due to filtration is mentioned, and a suggestion is made touching the local earth currents of using two electrodes. No new apparatus is disclosed, but only the electrodes connected with insulated wires, and a potentiometer, to measure differences in potential picked up by the electrode lowered into the fluid of the rotary drilled well, like those in the older patent, and in several others. No artificial current is involved. The disclosure states that in a mud-filled oil well the pressure from this fluid is kept greater than that in the porous strata traversed, (to prevent caving or a "blow out"), so that instead of the fluid in the strata coming out, the water of the drilling fluid is forced into the porous strata, causing electro-filtration effects with a reversed sign. Continuous diagrams or graphs exhibiting the changes in electric potentials are referred to, and their value in making comparisons with the results obtained in adjacent borings. These graphic representations, whose main value has turned out to lie in their comparison or "correlation", are not stated to be new and are not mentioned in the claim as part of the patent; nor were they new, but have long been used in recording any variable phenomena, whether due to heat, humidity, wind velocity, electricity, or other things. Claim 1, here in dispute, reads: "What I claim is, 1. An electrical process for the geological investigation of the porous strata traversed by a drill hole, consisting in filling the hole with water or mud and measuring in this fluid at various depths in the uncased part of the hole the differences of potential which spontaneously take place at the contact between the porous strata and said fluid."

■ If this claim be taken at face value, it precludes anybody from measuring at any depth in an uncased mud-filled well (almost all oil wells are drilled full of mud) any differences in potential which spontaneously take place, where porous strata are supposed to exist. It matters not what apparatus is used, or what precautions are discovered and taken to eliminate all but filtration potentials, or to amplify these latter for their better study, only the patentee can make these measurements. If Schlumberger had discovered electro-filtration potentials

in porous strata, he could not thus patent generally the use of a natural phenomenon. O'Reilly v. Morse, 15 How. 62, 14 L.Ed. 601. But he did not make that discovery, nor how to measure the potentials, or indeed so far as this patent is concerned, any new apparatus or any new method of measuring them or recording them. The use of the drilling fluid to make electrical contact with the various strata at first impresses one as a possible novelty, but the use of liquids instead of physical contact to close an electrical circuit was old in this very connection. It is not even specially mentioned in the disclosure. The potentials mentioned in this claim as measured are of course those existing nearest the electrode as it passes the place of contact between a porous stratum and the contacting penetrating drilling fluid; though other spurious potentials are likely to be present. The claim is too broad.

Besides the great breadth of Claim 1, we think it and the disclosure fail to point out and distinctly claim the part which the patentee says is his invention or discovery. The disclosure is full of statements as to what electrical effects occur in filtration, and what is done in practice, and what experience has shown. It is not said whose practice and experience are meant. In not a single place is there any clear statement that the applicant for the patent has discovered anything, and what it is. There is no compliance with this fundamental requirement of law.

As to both these patents we are further of opinion that no sufficient disclosure of methods is made to enable anyone to make useful electrical logs solely by their teaching and the knowledge of one skilled in electricity and well drilling. The commercially successful logs are the result of improvements and changes that required much research and experiment, and which were themselves in many cases found worthy of patents. The appellee has chosen indeed as far as possible to keep the public ignorant of its own practices and instruments, beyond the vague statements of the patents and the crude methods and instruments there disclosed. If the patents had expired the day this suit was filed, and nothing was known except what the patents disclose, neither appellant nor anyone else could have made useful electrical logs without much experimentation. The necessary substitution of alternating current for the direct current which was shown in the first patent, and the special apparatus necessary to use the same cable and instruments in the making of all the desirable curves in one quick operation, and to eliminate disturbing intrusions, were things that were slow in coming, and the results of independent research and experiment. We think that what Schlumberger in the disclosures of these patents gave to the public is not such as the statute contemplates to justify the broad monopolies claimed. Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221.

We therefore adjudge the contested claims of each patent invalid, and that the plaintiff-appellee is entitled to no relief and that its bill be dismissed.

Reversed and petition dismissed.