## YOUNGS RUBBER CORP. v. ALLIED LATEX CORP.

United States District Court
S. D. New York.
July 21, 1950.

Dean, Fairbank & Hirsch, New York City, and Richey & Watts, Cleveland, Ohio, Morris Hirsch, New York City, B. D. Watts, Cleveland, Ohio, and Arthur B. Colwin, New York City, for plaintiff.

Mock & Blum, New York City, Asher Blum, New York City, for defendants.

BONDY, District Judge.

This action is for infringement of Patents No. 2,213,113, issued August 27, 1940, and No. 2,244,591, issued June 3, 1941. Both patents relate to the testing of prophylactic articles of thin rubber.

Patent No. 2,244,591 was applied for March 30, 1939 and included the disclosure of both patents in suit. Patent No. 2,213,113 was applied for October 10, 1939, as a divisional application and was taken from its parent.

In the manufacture and sale of these prophylactic articles it is essential that they be as free as possible from holes or other imperfections. Therefore, testing them for such imperfections is of the utmost importance.

Prior to the two patents in suit, such articles were tested by inflating them with air and observing in various ways whether air escaped from them. The so-called Air Inflation and Facial Exploration Test in-

volved placing the rim of the article over a compressed air nozzle, inflating the article with air, and then manipulating it by forcing the air from end to end while holding the article against one's neck to determine whether air was leaking through any minute hole in the article. This required skill and vigilance on the part of an inspector. The test accordingly was subject to human error. Moreover, the cost of such testing was extremely high, exceeding the cost of producing the articles. Attempts had been made to perfect an automatic mechanism for air testing in order to reduce the manual labor and high cost of the existing methods, but without satisfactory results. Air inflation tests were practiced by plaintiff and others for about 15 years before the advent of the methods disclosed by the two patents in suit.

Patent No. 2,213,113 set forth an entirely different testing method. By this new test the rubber article was stretched over a rigid metal cylindrical form, which was then dipped into a tank containing tap water, the surface tension of which was reduced to a desired extent either by heating the water or by adding a wetting agent, such as aerosol. As stated by the patentee in his specification: " * * * should any article be imperfect, the liquid will pass or seep through the most minute hole or aperture in the article and spread out over the inner surface thereof between said article and its supporting mandrel and around such hole or perforation, thus producing a comparatively darker spot or area * * *, which is readily perceptible to the eye, and enabling an observer or inspector to discard that particular article because defective."

In carrying out this principle the patentee showed apparatus for mounting the mandrels or forms on an endless chain conveyor, the forms extending laterally from the conveyor so that they pass through a complete cycle in one complete traverse of the conveyor. Operators at a loading station mount an article on each form as it passes by; the forms then dip through and pass the length of the bath; tilt over the edge of the tank thereby returning to a horizontal position; and then pass to a visual inspection station where an inspector removes from the forms those articles which show dark areas resulting from the presence of a hole.

The evidence as shown by tests disclosed that the dark area thus formed was noticeable in the bath, after removal from the bath, and even remained visible after the outside surface of the rubber article had dried, the film of water around the hole in the article being retained between the article and the form over which it was stretched.

Thus, instead of expelling air from the inside of the article with consequent slow escape through a hole therein, as practiced by the air inflation test, by this new method the article was plugged with a solid form so that neither air nor water could possibly pass from the inside to the outside of the article; and if there was a hole in the article, the testing was of a visible dark area developed between the form and the article. The invention accomplished a new instrumentality for a new test.

As disclosed by the evidence, the advantages of this visual test over the prior air inflation test were the reliable, automatic, instant and satisfactory exploration of the entire effective area of the article while in the bath, and even out of the bath, revealing the dark area by the time the article had reached the inspection stage. The chance of error was reduced to a minimum, and the cost of inspection over prior methods and practices was considerably reduced.

Plaintiff, the patentee's assignee, promptly utilized the new method in its business, and has continued to do so from 1940 to date with considerable success.

Neither the Patent Office nor the defendant has cited any prior patents, publications or public uses anticipating the invention. Though the test may now appear simple, simplicity does not negative invention. See Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L. Ed. 721; Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281.

The joint application filed by Youngs and Ballentine on March 30, 1939 included: (1) "dark spot" method claims; (2) "dark

spot" apparatus claims; and (3) claims relating to electrical means. The Patent Office required a division of this joint application into three applications, one for each of the above types of claims. In compliance with this requirement the joint "dark spot" method and apparatus claims were cancelled on October 6, 1939, leaving intact in the joint application only those claims relating to electrical means. Thereafter, on October 10, 1939, Youngs, one of the joint inventors, filed a sole application claiming only the "dark spot" method claims. It was this sole application that resulted in the issue of Patent No. 2,213,113.

Defendant contends that the patent is invalid because it has not been satisfactorily established that Youngs was in fact the sole inventor of the method claims and, in any event, because the parent Youngs-Ballentine application is prior art. It also contends that since the "dark spot" apparatus claims of the joint application were not claimed either by the joint inventors or by Youngs alone, they were abandoned and hence defendant may freely use the apparatus.

■ Although the parent application was joint, the court is of the opinion that it was proper to file the divisional application as a sole application if the applicant was in fact the sole inventor of the invention claimed therein. Youngs filed an oath to that effect as required by 35 U.S.C.A. § 35. Cf. Rule 45(b) of the Rules of Practice of the United States Patent Office, 35 U.S.C.A.Appendix, following Section 114, effective March 1, 1949. Moreover, it was stipulated that if the patent attorney for Youngs and Ballantine were called as a witness he would testify that both inventors had informed him that Youngs was the sole inventor of the visual test method and that he (the patent attorney) drafted the divisional application accordingly. Defendant did not offer any proof that Ballantine had actually contributed to the invention of the visual test method, and the court is satisfied that Youngs was in fact the sole inventor thereof.

■ Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651; Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823, 830; and Wailes Dove-Hermiston Corp. v. Oklahoma Contracting Co., D.C., 48 F.2d 901, affirmed, 5 Cir., 56 F.2d 143, relied on by defendant to establish its contention that the parent application is prior art, are not in point because they do not involve divisional applications. Since "a divisional application is no more than an amendment in the parent application, at least unless 'new matter' be introduced in the specification * * *", Dwight & Lloyd Sintering Co. v. Greenawalt, supra, 27 F.2d at page 831, and is entitled to the filing date of the parent application, Wagenhorst v. Hydraulic Steel Co., 6 Cir., 27 F.2d 27, 31, the latter can not be deemed prior art over the former. Cf. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F. 2d 259; Hazeltine Research v. General Motors Corp., 6 Cir., 170 F.2d 6.

Whether or not strictly speaking there was an abandonment of the apparatus claims, defendant may not use the apparatus if such use infringes the valid method claims.

■ Each of Claims 1, 3, 4 and 6 of Patent No. 2,213,113 are charged to be infringed. These claims cover "the visual test method of producing a comparatively dark area which is readily visible through said article." Defendant stretches the articles over metal forms and then dips them into a bath containing aerosol, as a result of which, it has been stipulated, "water from the bath into any * * * hole spreads over the surface of the form with a resultant comparatively dark area visible through the article." Although such dark areas are plainly visible as a result of its procedure, defendant contends that it is not guilty of infringement because it disregards them and resorts instead to an electrical device to detect imperfect articles. While the visual method may not be part of defendant's regular testing routine, it is readily capable of being used by employing the services of an inspector. In any event, the court does not believe that defendant's employees at all times completely ignore the presence of dark spots. For example, frequent opportunities to observe the spots

arise in connection with checking the electrical apparatus to assure that it is in proper working order for testing purposes. It is slightly far-fetched to suppose that defendant's employees blink their eyes to the facts disclosed by the simple and convenient visual test only to resort to a more cumbersome and time-consuming manual checking device. "(A) machine that infringes part of the time is an infringement, although it may at other times be so operated as not to infringe." Wright Co. v. Herring-Curtiss Co., 2 Cir., 211 F. 654, 655. See also Marconi Wireless Telegraph Co. v. De Forest Radio Telephone & Telegraph Co., D.C., 225 F. 65, affirmed, 2 Cir., 225 F. 373.

■ Patent No. 2,213,113 is, therefore, held to be valid and infringed.

Patent No. 2,244,591, the Electronic Segregating Patent, employs electrical means to detect the holes in the rubber article while stretched over the metal form and while in a conductive bath. By this means the metal form is one electrode, the conductive bath a second electrode, and the rubber article the insulation or dielectric of a temporary condenser—a condenser that exists as such for but a few seconds while the article remains dipped in the bath through which it passes for the visual test. The metal form is connected to a charging electrode, at which voltage is applied to charge the temporary condenser, and thereafter the condenser passes to the testing electrode, which is connected through a conventional electrical or electronic circuit to a relay that gives a response depending on whether or not there has been a loss of charge due to leakage caused by a hole in the rubber article. What the inventors claimed as new was the employment of the rubber article as the dielectric of a temporary condenser moving in a conductive bath combined with a conventional electric circuit for testing the rubber article.

This invention was promptly put into use, and was and continues to be a valuable and successful contribution to the art; it eliminated the human element, and enabled those articles having holes to be discarded automatically.

The prior art relied on comprises the following: (1) Brehman No. 1,824,802, issued September 29, 1931, for electrically testing the insulation of electrical conductors together constituting a cable. The idea of a temporary condenser is not shown or suggested. (2) The Electrical World article of March 12, 1927, disclosed the testing of thick rubber gloves by filling them with water, immersing the gloves in a tank of water, and then applying a high voltage alternating current through the thickness of the glove and discarding those gloves that did not withstand the applied voltage; the high alternating current was to break through a bad glove and could not be used for charging a temporary condenser; there was no condenser, no charging action, no leakage, and no metal form within the rubber article to act as one of the electrodes of a temporary condenser. These two references were cited but withdrawn by the Patent Office during prosecution of the application. (3) Purdy No. 2,016,455, issued October 8, 1935, not cited by the Patent Office, is for an automatic machine for testing and sorting electric condensers of the fixed, permanent type; Purdy did not show or conceive the testing of a thin rubber article which was the dielectric of a temporary condenser while moving in a conductive bath; his device could not be employed for testing thin rubber articles. His test was a dry test, not a bath test.

Defendant asserts that the claims define the only point of novelty or contribution in a single "means" clause at the end of each claim in suit and therefore are invalid under Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. The claims in suit are not novel because of the concluding "means" clause, but because this concluding "means" clause is but part of the claimed combination of a rubber article stretched over an electrically conductive form, dipped and moved in a conductive bath, resulting in the formation of a temporary condenser, for automatic testing of a thin rubber article for holes.

■ Patent No. 2,244,591, accordingly, is held to be valid.

Claims 1, 5, 21 and 25 are charged to be infringed. All these claims recite the metal form, or a series of forms, with the rubber article thereon being moved through a conductive bath; electrical means connected to the form and bath, thus forming the temporary condenser; electrical means for charging the temporary condenser and for discharging it due to leakage, or not, depending on the presence of holes; and means responsive to the electrical means (a relay) for "indicating the presence" of a hole in the article. Defendant's apparatus uses substantially similar metal forms, stretches the rubber article thereover, conveys same through a conductive bath containing aerosol, forming a temporary condenser exactly as taught in the claims. It connects the metal form and bath to an electrical circuit for charging and discharging the temporary condenser depending on whether the article has a hole, that is, on whether or not there is leakage, and provides a relay responsive to the electrical circuit for testing a good article rather than a bad one. Defendant's apparatus differs in that the electronic response is due to the absence of a hole rather than the presence of a hole in the article, and because of this difference, it is asserted there is avoidance of infringement because the claims refer to "means for indicating" due to the presence, rather than the absence, of a hole. This difference is merely a matter of choice and does not avoid infringement.

Patent No. 2,244,591, accordingly, is held to be infringed.