YOUNGS RUBBER CORP. v. ALLIED LATEX CORP.

No. 210, Docket 21942.

United States Court of Appeals Second Circuit.

Argued March 9, 1951.

Decided April 30, 1951.

Dean, Fairbank & Hirsch, New York City, Morris Hirsch, New York City (B. D. Watts, Cleveland, Ohio, on the brief), for plaintiff-appellee.

Mock & Blum, New York City, Asher Blum and George E. Middleton, New York City, for defendant-appellant.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

After trial, the District Court held valid and infringed Patent No. 2,213,113, "Method for Testing Thin Rubber Articles," issued on August 27, 1940, to plaintiff's assignor, Arthur M. Youngs, and Patent No. 2,244,-591, "Apparatus for Testing Prophylactic Articles of Thin Rubber," issued on June 3, 1941, to plaintiff's assignors, Youngs and James S. Ballantine. 94 F.Supp. 285. Defendant has appealed from the usual interlocutory judgment of injunction and accounting, and denies both validity and infringement. Both patents relate to testing thin rubber articles, most commonly the rubber prophylactic sheath. Both inventions were disclosed in a single application of March 30, 1939, which, as required by the Patent Office, was divided, so that the second or "Electrical Test" patent was issued on the original application, while the first or "Visual Test" patent was issued on a divisional application of October 10, 1939. Both tests operate when the prophylactics are mounted on rigid cylindrical forms, or mandrels, attached to an endless chain conveyor—as with, or after, the manufacture of the articles themselves, as described in the companion patent action of Frank B. Killian & Co. v. Allied Latex Corp., 2 Cir., 188 F.2d 940. In both, the mandrels are immersed in water, so that if there is a hole in the article a discoloration appears about it visible to the naked eye—the "Visual Test"; or an electrical circuit, employing the metal mandrel and the water as conductors, closes, to actuate an indicator, or an ejector, of the defective article—the "Electrical Test." While

946

the ideas, especially the second, have proven useful and commercially successful, we do not find them to possess sufficient novelty to meet the present high standard of patentability.

We shall first consider the "Visual Test" patent. The patent rests upon the observed phenomenon that immersion of this thin type of rubber in water will show a discoloration around any hole which may exist in it. Thus the patent itself says: "The present invention is based essentially upon the discovery that by stretching prophylactic articles of thin rubber over a mandrel or other supporting form and then immersing the same in a bath of liquid, the said liquid will pass through even the most minute hole or perforation in the article and spread over the interior surface thereof between said article and mandrel producing a comparatively dark spot or area which is readily perceptible to the human eye." The remainder of the patent deals with means of making the immersion through use of a chain conveyor, with such details as the addition of Aerosol or similar substance to water to reduce its constant of capillarity and give it greater powers of penetration. In consequence "during immersion and travel of the articles through the bath" the liquid "will pass or seep through the most minute hole or aperture," producing the darker spot "readily perceptible to the eye, and enabling an observer or inspector to discard that particular article because defective." At the same time it is pointed out that the invention is not limited to the particular embodiment illustrated and described, but that changes and modifications may be made within the scope of the patent claims, which are very broad.[1]

 The defendant objects that this is but a patent upon a law of nature or a natural phenomenon. Objection thus expressed is too broad, since a method patent in general must ultimately come back to some law of nature or natural phenomenon; many a patent must rely on and make use of the law of gravity, the law of friction, the law of conservation of energy. But in general these will be found embodied in some process of a new or novel nature leading to the planned end. The defendant is on solid ground in urging that mere observation of a natural process can hardly be considered to possess such novelty. Otherwise one might expect the observable results of water on silks or satins or gravy on a necktie to appear as patents. The courts "have long, if not always, required that there be something in the originality,—something about the novelty, which makes the 'new' in the mechanism something to cause the court to say 'here an inventor labored.'" National Slug Rejectors v. A. B. T. Mfg. Corp., 7 Cir., 164 F.2d 333, 335, 336, certiorari denied 333 U.S. 832, 68 S.Ct. 459, 92 L.Ed. 1116. This is, of course, what is meant by the statement that one cannot "patent generally the use of a natural phenomenon," Halliburton Oil Well Cementing Co. v. Schlumberger Well Surveying Corp., 5 Cir., 130 F.2d 589, 592, 593, certiorari denied 318 U.S. 758, 63 S.Ct. 532, 87 L.Ed. 1131, or "epoch-making 'discoveries' of 'mere' general scientific 'laws,' without more," Katz v. Horni Signal Mfg. Corp., 2 Cir., 145 F.2d 961, certiorari denied 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432. See also O'Reilly v. Morse, 15 How. 62, 113, 114, 132, 133, 56 U.S. 62, 113, 114, 132, 133, 14 L.Ed. 601. We are aware that simplicity alone will not negative invention, Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721, but overwhelming simplicity must always have its effect in contradicting novelty. Great Atlantic & Pacific Tea Co. v.

---

1. Of the six claims, claims 1, 3, 4, and 6 are in issue. Claim 1 is typical, viz.: "The method of testing thin rubber articles to detect imperfections therein, such as holes, which consists in mounting an article upon a body arranged to support the same in a comparatively stretched condition, and then immersing said article thus mounted in a liquid bath for a predetermined period of time so that said liquid will pass through any hole in the article and spread over the underlying supporting surface of the body producing a comparatively dark area which is readily visible through said article."

Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127.

■ Although defendant vigorously denied making any use of this test in routine, claiming that it disregarded the visual showing because of its resort instead to an electrical device to detect imperfect articles, the trial court held: "While the visual method may not be part of defendant's regular testing routine, it is readily capable of being used by employing the services of an inspector. In any event, the court does not believe that defendant's employees at all times completely ignore the presence of dark spots. For example, frequent opportunities to observe the spots arise in connection with checking the electrical apparatus to assure that it is in proper working order for testing purposes." 94 F.Supp. 285, 287, 288. It is to be noted, however, that in the defendant's machine the possibility of inspection came only after the electrical test had operated to eliminate defective articles and that the forms after their immersion were in a place where one would hardly think of examining them and could not do so conveniently. Perhaps we should hesitate to upset the finding of fact of a trial judge on an issue of this kind. But we do think the situation disclosed illustrates the lack of worth of the patent. If a process is so natural that it has to happen before one's eyes in any event, so that one must put on blinders to avoid observation and a charge of infringement, the claim of inventive genius in its discovery is hard to credit. Our holding of invalidity for lack of novelty makes it unnecessary to consider other attacks upon it, such as that the original application was joint and the divisional application was in Youngs' name alone, without adequate disclaimer from Ballantine.

■ Next we turn to the "Electrical Test" patent. The inventive device is an embodiment of the idea of the electrical circuit, with metal and water as conductors and rubber as a nonconductor. Given an electric charge with a closed circuit except for the presence of the rubber, it is clear that a hole in the current will complete the circuit. The flowing current then ac- tivates a separate indicater circuit disclosing the defect to the operator. That is the basic structure of the invention.

More in detail the operation of the device is as follows: As with the "Visual Test" patent, the metal mandrel upon which the prophylactic is mounted moves forward on an endless chain conveyor through a grounded tank of water to which has been added Aerosol or similar substance to increase penetrability. The mandrel is not so far submerged that the water will make contact with it unless the article is defective; if the prophylactic is good it effectively insulates the mandrel and the water from one another. The uppermost end of the mandrel, which is in a downward pointing position as it moves through the water, successively encounters three electrodes. The first is grounded to remove any residual static charge previously accumulated. The second is connected to the water trough through a power source and impresses a charge on the mandrel which, if the prophylactic is sound, will remain there until the testing process is over. The third electrode is the test electrode proper. From it a lead is run through a relay to a power source which is connected from its other terminal to the water trough. Here again a voltage is impressed on the mandrel. If the prophylactic is sound, no current will flow through the circuit and the relay will not act. But if the article is defective, the circuit will be completed directly through it, current will flow through the relay, and the relay will activate a separate "indicator" circuit which informs the operator that the defective article must be removed and discarded. Ordinarily removal is done with a brush, though plaintiff's machine also embodies a compressed-air blowoff device which, though not in issue here, can be hooked up so that the indicator circuit will "trigger" it automatically.

It will be noted that contact with the first two electrodes is essentially a conditioning process to prevent a "surge" of potential or a false charge which might momentarily disturb the delicate indicator and thus temporarily mislead the operator

or even "trigger" the removal device if that is in use. Contact with the third or "test" electrode is the important step; that embodies the inventive idea claimed in the patent and in the claims 1, 5, 21, and 25 here in issue. These, after describing the "electrically conductive element," i. e., the mandrel, and the "trough" for immersion of the rubber article stretched on the mandrel, proceed to state the essential invention in language such as this of claim 1: "electrical means connected to the element and said trough and *operable in response to the presence of a hole in the article,* and means operable by said electrical means for indicating the presence of a hole in said article." (Emphasis added.) As to this, plaintiff's expert testified that it had been known for a great many years—more than his professional career of 40 years—that insulating materials might be tested for holes by subjecting their opposite faces to a difference of electrical potential in order to see if the electrical current would leak through fine holes or imperfections. He also said that water as one conducting medium for one face of the insulating material and metal for the other was well known before the patent, and that the current leaking through could be shown by a sensitive meter. His further testimony was that the addition of Aerosol or soap to the water—or heating the water as the patent itself suggested—was to reduce the surface tension of the water and thus speed up the passage of water through the hole.

It will thus be seen that the patentees took one of the oldest of electrical conceptions and adapted it rather ingeniously to a particular need of this business. Undoubtedly this would have been held invention in times past, but now the climate of opinion has changed to require definite novelty in idea, and not merely new adaptations of an old idea. Cases notable for their rejection of such adaptations include Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235; Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; and our own Bostitch, Inc. v. Precision Staple Corp., 2 Cir., 178 F.2d 332. See Paramount Industries v. Solar Products Corp., 2 Cir., 186 F.2d 999, 1000. Plaintiff urges that the climate of opinion is again shifting, citing the opinions in Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672; Id. 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097. But that case dealt specifically with the question of equivalents to show infringement, and later decisions do not support the plaintiff's reading of directional signals. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; Crest Specialty v. Trager, 71 S.Ct. 733. There appears to have been considerable commercial success in both these patents, although we are hardly given comparable yardsticks of the kind suggested in Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 184 F.2d 652, 654. Nevertheless, as the recently decided Supreme Court cases show, "commercial success without invention will not make patentability." See, e. g., Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 153, 71 S.Ct. 127.

It is perhaps interesting that an obvious need was not met sooner in this industry and certainly in old days that would have told strongly in favor of the patent. The testimony was that the necessary testing of these articles was by crude devices, including such hand operations as blowing up of each one by the operator and holding it against the face or neck to see if the air was coming out. There is not much in prior patents which appears to be close. The two patents cited, Brehman No. 1,824,-802 of 1931 and Purdy No. 2,016,455 of 1935, do show in a general way the use of electrical current for testing, the first for testing the insulation of electrical conductors, together constituting a cable, and the second an automatic machine for testing and sorting electric condensers of the fixed permanent type.

More directly in point is an article in the "Electrical World" for March 12, 1927, which described a means of testing rubber gloves to be used by men working on high voltage transmission lines, then in practical operation by the Pacific Gas & Electric

Company. The device there pictured and described showed a grounded tank of water from which a lead was taken through a power source to an indicator. From the other side of the indicator was a lead to a horizontal metal rod to which were attached metal chains allowed to hang vertically. The lower ends of these chains were dropped into the upper and open ends of the gloves, which were themselves filled with water. When the voltage was raised to the required test level, current would flow through the indicator if the article was unsound, but not otherwise. Here, then, was a device in use for testing rubber goods by using electrical current conducted through water; we see no substantial difference between the water as the conductor on both sides of the article as in this device and the water and metal of the patent under consideration here. The fact that one was a high-voltage test for imperfections, rather than holes, in the glove, while the other was one of low voltage for holes, seems a difference in degree, and not of kind. We think therefore that the "Electrical World" article must be considered a printed anticipation of the plaintiff's device, of which the patentees here must be held to have knowledge within the rule of cases such as Downton v. Yeager Milling Co., 108 U.S. 466, 3 S.Ct. 10, 27 L.Ed. 789, and Cohn v. U. S. Corset Co., 93 U.S. 366, 23 L.Ed. 907. As Judge L. Hand said in Merit Mfg. Co. v. Hero Mfg. Co., 2 Cir., 185 F.2d 350, 352, "as the law stands, the inventor must accept the position of a mythically omniscient worker in his chosen field. As the arts proliferate with prodigious fecundity, his lot is an increasingly hard one." We conclude therefore that the plaintiff cannot be accorded a patent monopoly in this use of the electric circuit.

We should note that were the patent not thus to be held invalid we should have no difficulty in finding infringement. The defendant's device appears to follow so directly the plaintiff's idea, with only the merest reversal of positions—and of circuits—in the form of testing, as if consciously in search of a formal opposite to plaintiff's method. Defendant uses a test through a tank of water employing electrodes to the same end as plaintiff, except that while the plaintiff's device discards the defective articles, the defendant's machine "positively selects the good." Of course it is a matter of elementary elecrical engineering to adjust the means by which an indicator is induced to flash or not to flash, a relay to open or close a circuit, or the grid bias on a vacuum tube to become positive or negative; and all of defendant's semantic difficulties with various labels, such as dielectric, condenser, resistor, or the like, do not change this fact. Defendant is here caught with the kind of proposition which in opposite terms it would apply to the plaintiff; if so narrow a distinction as it asserts is enough to protect it, then surely plaintiff's idea must be considered a novelty different from former uses. Indeed the contrary appears to have been held in Application of Cremer, 173 F.2d 376, 36 C.C.P.A., Patents, 980, in affirming refusal of defendant's conflicting claims for a patent. As a matter of appropriate word usage, plaintiff's claims noted above do appear to read directly upon defendant's device. Defendant says that its machine acts not in response to a hole in the article, but to the absence of a hole. Such word chopping cannot conceal the fact that the test demonstrates to the operator the existence or nonexistence of a hole by means of the electrical circuit. Moreover, since when has nonaction been lacking in important juridical consequences? Which is the more important discovery, that an electric bulb will light, or will not light, in a darkened room? So the plaintiff must sadly discover that in law a privilege or no-right, Hohfeld, 23 Yale L. J. 16, 32–44; Cook, 28 Yale L. J. 387, 391, is fully as important as a right.

The judgment is reversed for dismissal of the action.